PAULINE WHITE v. ST. LOUIS & MERAMEC RIVER RAILROAD COMPANY, Appellant.

Division One, March 28, 1907.

1. **MOTION TO ELECT: Made and Overruled at Previous Term: Orally Reviewed.** A motion to compel plaintiff to elect on which act of alleged negligence she would go to trial, made and overruled at a previous term, and renewed orally before the trial commences, should be again overruled. The statute contemplating that pleadings should be in writing includes demurrers, motions to elect, etc. Besides, the ruling at the previous term is not for review on appeal unless an exception thereto was preserved by a term bill of exceptions presented to the appellate court.

White v. Railroad.

2. ———: Negligence: Inconsistent Allegations: Speed: Stopping Car. A petition which charges defendant's negligence to be excessive rate of speed, and in not stopping its car in the shortest time possible on seeing a person on the track or approaching towards it, does not contain allegations that are "contradictory and inconsistent," and therefore a motion to elect on that ground should be overruled. They do not destroy each other. Both can stand, and both be true.

3. ———: Specific Grounds: Exclusion of Others. Where a motion to elect specifies inconsistency, movant is precluded (under the statute) from urging any other ground.

4. ———: Ordinance and Common Law Negligence: Blended in Same Count. Whether the negligence complained of arises from the violation of a common law duty, or a statutory duty, or an ordinance duty, so long as the violated duties produce one injury and the one damage constituting the subject-matter of the suit, it is not error to blend the various acts of negligence in the same count of the petition. The mere origin of the negligence is of no significance. Excessive speed which amounts to negligence at common law, and negligence in failing to stop the car as the ordinance prescribes, can be pleaded in the same count.

5. ———: ———: ———: Eliminated from Case by Instruction. Where the petition charges excessive speed and negligent failure to stop the car after the injured party's dangerous position was discovered, and only the latter issue is put to the jury, it is immaterial whether or not the allegations are inconsistent and contradictory, or whether or not both were made in the same count of the petition, and that a motion to elect was overruled. No injury can come to defendant from the presence in the petition of elements of negligence eliminated by instruction.

6. ———: After Joinder: Waiver. Excepting the two cardinal defects of failure to state a cause of action and lack of jurisdiction, all defects in the petition are waived whenever in the evolution of a lawsuit the case once advances to the stage of joinder of issues on the facts pleaded. Hence, when defendant refuses to stand on its motion to elect, files answer, goes to trial, and takes the chance of winning or losing on an issue of fact, it abandons its motion to elect, unless the allegations are so contradictory as to be self-destructive, and therefore state no cause of action. Such a motion is of no more dignity or potency than a motion to make more specific and certain, a demurrer, or a motion to strike out because of departure or because of redundant, irrelevant or frivolous matter.

7. **NEGLIGENCE: Stopping Car: Case for Jury.** Plaintiff's expert testified that the street car, which struck the wagon plaintiff's husband was driving, could have been stopped in 150 feet when going twenty miles an hour, and in forty feet when going eight miles; and one witness put the horses on the track when the car was 150 feet away, and another put it still further away. *Held*, that the case should have gone to the jury, on the issue of whether defendant was guilty of negligence in not stopping the car before it struck the wagon.

8. ———: ———: ———: **On Motorman's Testimony.** The motorman testified that he saw the heads of the horses appear in the cross street when his car was 75 feet from the place of the accident; that warned by the progress of the horses towards the track he got his car within control and had reduced its speed to two or three miles an hour while running 35 or 40 feet, and that he then discovered deceased was about to cross the track 40 or 50 feet in front, when he applied the reverse; and that he was unable to stop the car in running the 40 or 50 feet more, with the aid of the reverse and sand. *Held*, that it was for the jury to say whether or not the car could have been stopped in this forty feet by the use of the emergency appliances.

9. ———: **Contributory: Defense.** The fact that a driver of a wagon negligently put himself in a position of peril from an on-coming street car, did not warrant the defendant, who had notice of his peril, in running him down. It was still the duty of defendant to exercise ordinary care to avoid injuring him.

10. ———: ———: **Wantonness.** Wilfulness, recklessness and wantonness are not indispensable elements upon which to base a right of action for the wrongful death of a person guilty of contributory negligence. If the defendant, in control of a dangerous instrumentality, in the exercise of ordinary care could have prevented an injury to a traveler in a public street who had negligently placed himself in danger of such injury, and failed to exercise that care, defendant is liable, whether or not defendant's failure was wilful, reckless or wanton.

11. ———: **Instructions.** Two instructions given in this case are held to be proper declarations of law on the subject of negligence, and to follow approved precedents.

Appeal from St. Louis City Circuit Court.—*Hon. Walter B. Douglas,* Judge.

AFFIRMED.

*Jefferson Chandler, T. M. Pierce* and *S. P. Mc-Chesney* for appellant.

(1) The court erred in overruling defendant's motion to require plaintiff to elect whether she would stand upon common law negligence or ordinance negligence, because both inconsistent assignments of negligence could not properly be joined in the same count. Clancy v. Railroad, 192 Mo. 640; McHugh v. Railroad, 190 Mo. 85; Behen v. Railroad, 186 Mo. 430. (2) The court erred in refusing to give at the close of plaintiff's evidence and at the close of all the evidence instructions in the nature of a demurrer to the evidence asked for by defendant: (a) Because there was no evidence of negligence on the part of defendant. Lee v. Jones, 181 Mo. 299; Feary v. Railroad, 162 Mo. 75; Roenfeldt v. Railroad, 180 Mo. 554; Markowitz v. Railroad, 186 Mo. 350; Cogan v. Railroad, 101 Mo. App. 179. (b) Because the evidence shows conclusively that the injuries complained of by plaintiff were due to the continuous, concurring and contemporaneous negligence of deceased directly contributing to the injuries received. Guyer v. Railroad, 174 Mo. 351; Van Bach v. Railroad, 171 Mo. 347; Payne v. Railroad, 136 Mo. 534. (3) The court erred in instructing the jury of its own motion. The instruction was erroneous because there was no evidence of any willful, wanton or reckless conduct on the part of the servants of defendant, and the so-called humanitarian doctrine was neither plead nor put in issue by the proof. Clancey v. Railroad, 192 Mo. 560; Holwerson v. Railroad, 157 Mo. 244; Woods v. Railroad, 188 Mo. 258; Tanner v. Railroad, 161 Mo. 511; Sharp v. Railroad, 161 Mo. 235.

*J. L. Minnis* for respondent; *James M. Rollins* and *J. A. Rollins* of counsel.

(1) (a) Defendant's motion to elect came too late. Secs. 598-602, R. S. 1899; Paddock v. Somes, 102 Mo. 226. (b) The motion was without merit. McCarty v. Rood Hotel Co., 144 Mo. 402; Riska v. Railroad, 180 Mo. 183; Clancy v. Railroad, 192 Mo. 641; Moore v. Railroad, 194 Mo. 13. (c) The assignments of negligence were not inconsistent. Moore v. Railroad, 194 Mo. 1; Latson v. Railroad, 192 Mo. 449. (d) If the court committed error in overruling the motion, the error was cured by submitting only one assignment of negligence to the jury. Gardner v. Crenshaw, 122 Mo. 79. (2) The evidence warranted the court in submitting the cause to the jury. Moore v. Railroad, 144 Mo. 1; Latson v. Railroad, 192 Mo. 449; Riska v. Railroad, supra. (3) The court did not err in giving instruction 3 of its own motion. Cases last above cited. (4) Instruction 3 and defendant's instruction 2 are consistent. Moore v. Railroad, 194 Mo. 12; Moore v. Railroad, 193 Mo. 420; R. S. 1899, secs. 659-865.

LAMM, J.—Pauline White is the widow of Edward White, who was killed while driving a loaded wagon at half past five o'clock p. m. on the 17th day of January, 1902, by a collision with one of defendant's street cars in the city of St. Louis. His widow sued and recovered $5,000 statutory damages. After the customary precedent steps, defendant appeals here.

Attending to the pleadings, plaintiff grounds her right of action on the following charges of negligence:

First, that while her husband was lawfully driving a two-horse wagon loaded with lumber, north on Twenty-first street, where it intersects Wash street, and when he was about in the middle of said intersec-

tion, the agents and employees of defendant in charge of a certain car going east on Wash street so negligently and carelessly ran, managed and controlled said car as to cause it to run into and against said wagon, overturning the same and so injuring her husband that he died as a result of the injuries sustained.

Second, for a further assignment of negligence it is alleged that defendant's said agents and employees failed to slow up said car as it approached said intersection, which negligence directly contributed to cause and did cause the injury and death of her husband.

Third, plaintiff then pleads an ordinance of St. Louis, known as the Vigilant Watch ordinance, requiring motormen and conductors to keep a vigilant watch for vehicles, either on the track or moving towards it, and to stop the car in the shortest time and space possible on the first appearance of danger to such vehicle, and avers its violation, for that the motorman and conductor of the car doing the injury negligently failed to stop said car within the shortest space and time possible upon the first appearance of danger to plaintiff's said husband; and plaintiff says such negligent violation of said ordinance directly contributed to cause and did cause his injury and death.

Fourth, and for a further assignment of negligence, plaintiff pleads the provisions of an ordinance regulating the speed of street cars in St. Louis at a maximum of eight miles per hour, that the provisions of said ordinance were negligently violated and such violation of said speed ordinance directly contributed to cause and did cause the injury and death of plaintiff's said husband.

The answer tendered the general issue, and pleaded facts which, if true, constituted contributory negligence on the part of deceased.

The reply put in issue the new matter in the answer.

The case came on for trial in February, 1904. It

seems the suit was brought prior to April, 1902, and that on the 9th day of April, 1902, defendant filed a motion requiring plaintiff to elect "upon which count of the petition she seeks to recover." Technically there was but one count in the petition, and the different elements constituting the negligence resulting in the death of Edward White were all set forth in that one. There seems to have been at least one prior trial, if not more; and we infer the motion to elect had been overruled at a prior term. It is not shown that any exception was saved to the first action of the court in overruling this motion; but when the final trial came on defendant's counsel undertook to orally "renew" the old motion to elect, and the record shows the court overruled it again and defendant excepted. The old motion, so "renewed" orally at the trial, was as follows:

"Now comes defendant in the above-entitled cause and moves the court to compel plaintiff to elect between the averment of her petition that the alleged injuries to Edward White were caused by the car being run at a rate of speed in excess of eight miles an hour, in violation of an alleged ordinance of the city of St. Louis, and that the alleged injuries to Edward White were caused by the car being run at a rate of speed in excess of eight miles an hour, in violation of an alleged ordinance of the city of St. Louis, and that the alleged injuries to Edward White were caused by said alleged conduct; and the averment that said injuries were caused by the motorman and conductor failing to stop said car in the shortest time and space possible on the first appearance of danger, and for grounds of said motion assigns:

"1. That said allegations are contradictory, inconsistent, and one destroys the other.

"2. That even if the car was in fact going faster than eight miles an hour, and there was in fact an or-

202 Sup—35

dinance limiting the speed to eight miles an hour, still if such rate of speed caused the alleged injuries then they could not have been caused by the failure to stop the car in the shortest time and space possible at the first appearance of danger, and if on the first appearance of danger the car could have been stopped in time to prevent the alleged injuries, the said alleged injuries could not have been the result of the speed at which the car was running.''

Attending to the facts uncovered below, they are as follows:

Wash street is sixty feet in width and runs east and west. The sidewalk on either side is twelve feet wide, leaving the travelled way for vehicles thirty-six feet from curb to curb. Defendant has two tracks on this street—the south for east-bound cars, the north for west-bound cars. A block or so west of the place of the accident, Wash street takes a turn, but from the place of the accident to this turn there are no obstructions to vision in the street. The grade from the west to the east is a down grade of two and three-tenths per cent. The south track was so laid in Wash street that its south rail was 10 feet 2 inches from the curb line. The building line, being twelve feet farther to the south, would be twenty-two feet five inches from the south rail. Twenty-first street runs north and south, cutting into and intersecting Wash at an angle of ninety degrees and is of the same width. Anyone standing in Twenty-first, in a continuation of the south building line of Wash, can look west a block. But there was a building at the southwest corner of Twenty-first and Wash. Hence, anyone approaching Wash on Twenty-first going north, would have to be in (or past) this building line to see a block west. But it was in evidence that if a man stood in Twenty-first street, thirty feet south of the south rail, he could see one hundred feet west in the middle of the east-bound track.

So much for the *locus in quo.*

At the time in hand decedent was driving north on Twenty-first street and approaching its intersection with Wash. He was driving a team of horses hitched to a wagon arranged for hauling wood and lumber. His wagon had no bed, but had a frame suited for plying his business—that of a teamster—and on this occasion was heavily loaded with slabs cut in four-foot lengths. His load, as we understand it, was built up, say, four or five feet above the running gear of the wagon; and he was seated on top of the load, at such a distance back of the rumps of the horses as an ordinary wagon seat would be in an ordinary wagon bed. Allowing some play for the tugs, the singletrees and doubletree—allowing effect to the testimony which made the length of an ordinary horse ten feet from nose to tail—it would seem that the noses of a team of horses coming out of Twenty-first street into Wash would be at least thirteen or fourteen feet in front of the driver, and that a motorman could see the team while it was traveling that distance before he could see the driver or the driver could see the car.

In this condition of things, Edward White drove north into the intersection of Wash and Twenty-first streets and had crossed over the south track of defendant to such distance that when an east-bound car collided with his wagon, it upset the wagon, throwing it north of the south track. The evidence tends to show that the car struck the wagon either in its center, or at the hind wheel, overturned it, and the load falling on Edward White, crushed his skull, killing him instantly. There was evidence tending to show that White was driving at a moderate pace. One witness testified he was going at a fast walk; another witness, that about the time of the collision, he was going very fast. But the great weight of the testimony tended to show he was traveling the ordinary gait of a work team pulling a heavy load.

One witness for plaintiff (Mrs. Conway) testified the car, when she first saw it, was about 150 feet away from the crossing and that it was then running from eighteen to twenty miles an hour. The force of this testimony is impaired by the fact that the record does not disclose the witness qualified to give a speed opinion. She had come into Wash street from Twenty-first, and says she first saw the car and then turned her head and saw the wagon, and the substance of her testimony is that the heads of the horses were about on the track when the car was 150 feet away. She says she saw the driver look up and down, and that he looked west, and she saw him "chop" his horses with the lines. We take it from the context that the witness meant to be understood as saying that at that very time the horses were just on (or to) the track, and the car 150 feet away.

A little girl, Lola Sanders, stood at the northeast corner of Wash and Twenty-first. She had been to a grocery located on the northwest corner and had crossed Twenty-first street, facing east at the time, and heard the collision, and the crash caused her to look back. According to our interpretation of this child's testimony she had seen the car and the wagon, before she crossed from the northwest to the northeast corner. She says that when she first saw the car it was midway of the block—150 or 200 feet away, and that at that time the horses were about on the track —that is, their heads were about on the track. She locates the car at that critical juncture as in front of the residence of Mrs. Sandmeyer, who lived in the center of the block. The Sandmeyer residence was located by other evidence as 216 feet west of the intersection. Lola Sanders says she remembered the day and it was clear and dry and the track was dry. Another witness for plaintiff, Finan, a policeman, testified "it was a muddy kind of a day," it was not raining, and he did not notice the track, but the streets were not dry.

Another of plaintiff's witnesses testified he was standing on the northwest corner, and when he first saw White he was a few feet south of the track, and the car was then a quarter of a block away.

Referring to the force with which the car struck the wagon, plaintiff's evidence tended to show, in substance, that the crash was heard by Simpson and Burke, who were inside close-by houses. The crash was heard by another witness one hundred feet away. It was heard by Finan, the policeman, who was walking his beat on Twenty-first street between Morgan and Franklin avenues—at least a block and over from Wash street. But it was further shown by plaintiff's witnesses that neither the horses nor the wagon were injured, and the car was being slowed up at the moment of the collision and soon came to a stop—one witness saying the east end of the car stopped at a continuation of the east line of Twenty-first street. And, as pointed out heretofore, the force of the collision was sufficient to knock the wagon off the south track and overturn it, top-heavy as it was.

Plaintiff also placed an expert on the stand to prove in what distance the car could have been stopped, and by him showed that at twenty miles an hour it could be stopped in 150 feet, and at eight miles an hour it could be stopped in forty feet.

Plaintiff offered in evidence and read subdivision number 4 of section 1760 of the Municipal Code of St. Louis, known as the Vigilant Watch ordinance, providing as follows: "The conductor, motorman, gripman, driver, or any other person in charge of each car shall keep a vigilant watch for all vehicles and persons on foot, especially children, either on the track or moving towards it, and on the first appearance of danger to such persons or vehicles, the car shall be stopped in the shortest time and space possible."

No speed ordinance, however, was put in, and we might as well say here that by defendant's instruction

number 10 the jury were told there was no evidence to support the charge in the petition that there was an ordinance of the city of St. Louis limiting the speed of the car to eight miles an hour, and the jury must disregard said charge.

Plaintiff produced an eye-witness, Bessie Glassman—from Russia, into this country, these nine years gone. It will not be necessary to dwell on her testimony. She evidently was puzzle-headed, did not see things in the true perspective, and her story is told with incoherence, possibly arising from the poverty of her language. She testified the car was half a block away when the wagon was about half way across the tracks; that she was attracted by Mr. White's "yelling" to the "car-company" to stop; that when she first saw the horses they were running "awfully fast" —two or three times faster than a person can walk, from eight to twelve miles an hour. Further that "when I saw the yelling, at that time I heard the strike," and then looked no more because she was scared. She said Mr. White took the lines and made the horses go quicker, "because he could not go quicker when the car was coming."

Such was plaintiff's case, with the added fact in proof that the *locus in quo* was a much-frequented spot.

On defendant's part it was shown by one expert that a car of the kind in question, at the place in question, going at seven to eight miles an hour with a light load, could be stopped in between seventy-five and eighty-five feet. This witness was the road officer of defendant company, and he further testified that the car in question could not run at a speed of twenty miles an hour. Defendant produced another expert, an employee, Mr. Risk, one of its motormen, who was familiar with the car and appliances, with Wash street and its grade at the intersection. He testified that, running down grade on the east-bound track at the

point in question at the rate of twenty miles an hour with a light load, a car could be stopped in about eighty or ninety feet. He so said twice. On being further pressed in his examination in chief, he said he did not understand the question asked him, and, thereupon, he placed his estimate at 125 to 130 feet, and said that the change in his testimony came from the fact that in his first responses he did not figure on as steep a grade as actually existed. Moreover, he testified that a car going at eight miles an hour could be stopped in from seventy to eighty feet.

Defendant produced its motorman and conductor —the testimony of the latter being of no material value. The motorman, Muldoon, testified that he stopped the car at Twenty-second street (a street one block west of Twenty-first) and let off passengers there, and then started up to continue on his way down town—that between Twenty-first and Twenty-second streets, in a distance of about three hundred feet, he had got up speed to nine miles an hour; that he kept a vigilant watch ahead; that when his car got about seventy-five feet from Twenty-first street he saw the heads of the horses appear in the line of Wash street; that he continued to ring his gong and put on his brake at the same time and thought the team would stop; that when he first saw that the driver was going to cross he did all in his power to stop; that when he got right close to the wagon he released his brake and applied the reverse, and that the reverse caused the wheels of the car to revolve in the opposite direction; that the horses were going in a moderate walk and the man was seated in the front of his wagon, and that he put on his reverse when the horses were on the track. He further testified that he saw the whole progress of the horses from the instant their heads appeared in the line of Wash street until the collision; that the bumper of the car struck the wagon about the center; that the center of the wagon was in the center

of the track, and the rear wheels were on the south
side of the track, and the front wheels were on the
north side or about on the track; that the north side
of the car's bumper struck the rear part of the front
wheels, and the other part of the bumper, the other
part of the wagon; but that the collision was not with
the rear wheel of the wagon; that the wagon turned
over on its side and was partly on the east-bound track
and partly on the west-bound track, but the lumber all
fell over on the north side of the south track; that
just the moment the car hit the wagon, it, the car,
started to back up. He further said that when he first
saw the horses he applied the brake to get the car
under control; that he always applied the brake going
down grade; that in this instance he had not applied
it all the way down—about half way down; that when
he commenced to apply the brake he did that to take
up the slack, and that was all he did until he got
within seventy-five or eighty feet of Twenty-first
street; that up to a certain time he thought the driver
was going to stop; i. e., that when the horses were
entering on the track and then his car was forty or
fifty feet away; that he had traveled thirty feet while
White had traveled twenty-two feet; that when the
horses' heads appeared in the line of Wash street he
commenced to reduce the speed; that about forty or
fifty feet away from the wagon he applied his reverse,
and that at that time, the time he applied his reverse,
he had got the speed down to two or three miles an
hour, and after that he went forty or fifty feet until
the collision occurred. He further said that at that
rate, by the use of the reverse, he could not stop in
forty feet. Then this question was asked: "Q. You
tell the jury then, that a car running eight or nine
miles an hour, that within thirty-five feet you could
check its speed to two or three miles an hour, yet you
could not stop it within forty feet, is that your testi-

mony?'' His answer was: ''Yes, sir. That is what I said.''

Respondent's additional abstract shows, among others, the following questions and answers during the cross-examination of Mr. Muldoon:

''Q. Now, what else did you do towards stopping the car when Mr. White's horses entered about forty or fifty feet upon the track, besides having already applied the brake, and reversing the car, did you do anything else? A. That was all I could do.

''Q. That was all you did? A. Before I reversed I released my brake so my reverse would take good.

''Q. You released your brake and then reversed? A. Yes, sir.

''Q. Is that all you did? A. That is all I could do.

''Q. Is that all you did? A. Yes.

''Q. That is all? A. Yes, sir.

''Q. Now, you have a sand box on your car, haven't you? A. Yes, sir.

''Q. And the reason you have that sand box is, when on slippery tracks, or a wet track, to prevent your wheels from sliding on the track, and to stop the car you apply the sand to the tracks? A. Yes, sir.

''Q. I will ask you if it is not a fact that when you apply sand to the track and apply your brake that you stop a car in much shorter time than when you do not apply the sand? A. Yes, sir.

''Q. And the reason of that is that the sand tends to keep the car from slipping? A. Yes, sir.

''Q. You tell the jury at that time on your car part of the appliances for use was this sand, and you did not use it. A. I used the sand also.

''Q. Didn't you say three or four times in reply to my question that the only thing you did when you saw Mr. White upon the track was to release the brake? A. Yes.

''Q. And reverse the car? A. Yes.

"Q. Then did I not ask you twice afterwards if that was all you did? A. Yes.

"Q. And you said it was, didn't you? A. That is all I could do with my hands. All I did except apply the sand on the rail with my foot.

"Q. Then the application of sand is an important element in stopping the car, is it not? A. Not so important.

"Q. Not so important? A. Yes.

"Q. When did you apply the sand? A. I applied the sand after I saw he was coming on the track.

"Q. What? A. Yes, sir; I applied the sand after I saw he was coming on the track.

"Q. That is when he was fifty feet away? A. I don't know how far away.

"Q. You said forty or fifty feet? A. Yes.

"Q. What was the result of reversing your car when you saw him on the track? By reversing the machinery what do you make the wheels do? A. It made the wheels turn over.

"Q. From the time you reversed the car, the wheels turned in an opposite direction the car was heading? A. Yes.

"Q. Now, you want the jury to understand from the time you saw Mr. White enter upon the track after he was forty or fifty feet in front of you, you applied the sand on your car at that distance? A. Yes, sir.

"Q. That is your testimony? A. Yes, sir.

"Q. And that while the car was running two or three miles an hour, at that time you applied your reverse? A. Yes, sir."

Defendant produced an eye-witness, Mr. Watkins, who placed himself at the northeast corner of Twenty-first and Wash, and who said he saw the car when it struck the wagon; that when he first saw the team it was just in the act of going on the track in a moderate walk; that when he first saw the car it was about sixty or sixty-three feet away from the wagon, and the mo-

torman was ringing the gong at that time. On cross-examination he testified that his attention was first called to the car by the ringing of the gong. He noticed the motorman was trying to stop the car; that when he first saw the wagon and team the front feet of the horses were in the act of going on the track; that the car was going at a "medium rate" and was slowing up and checking its speed until it struck the wagon; that the wagon had about passed over the track when it was struck; witness noticed that the car was about opposite a post when he first noticed it, and he stepped the distance from where he was to the post and found it to be about sixty or sixty-three feet.

Such was defendant's case.

At the close of the evidence defendant was refused a peremptory instruction in the nature of a demurrer and saved its exception.

On plaintiff's prayer the court gave two instructions, only one of which is criticised; and that one reads as follows:

"1. The court instructs the jury that if they believe from the evidence that on the 17th day of January, 1902, the defendant was operating the railway and car mentioned in the evidence as colliding with the wagon of Edward White at the intersection of Twenty-first street and Wash street, in the city of St. Louis, then it was the duty of the motorman of said car, upon the first appearance of danger to a person or vehicle either on the track or moving toward it, to have stopped said car in the shortest time and space possible under the circumstances, consistent with the safety of said car and the passengers on said car; and in this case, if the jury find from the evidence that the motorman in charge of defendant's car saw Edward White on his wagon upon defendant's track or so near the same as to be in danger of injury, and thereafter could have stopped said car without injury to the same or to its passengers, and by so stopping said car within

the shortest time and space possible, under the circum-stances, consistent with the safety of said car, and its passengers, could have averted injury to said White and neglected to do so, in consequence of which neglect to stop, said White was killed; and if the jury further find from the evidence that plaintiff was the wife of Edward White at the time of his death, then the plaintiff is entitled to recover $5,000, no more and no less.''

Followed the foregoing, the court gave several instructions, *ex mero motu*, only one of which is criticised, to-wit, number 3, reading:

''3.  The negligence of White (if you find him to have been negligent) must have directly contributed to or caused the collision and injury in order to be a bar to plaintiff's recovery; and even though you may believe that White was negligent in going upon the track, still, if you believe from the evidence that the defendant, by the exercise of ordinary care, could have stopped the car with safety to the car and the persons thereon, in time to prevent the collision, after the motorman had discovered the fact that White was in an apparently dangerous situation (if you believe from the evidence that the motorman did so discover) and thereafter negligently failed to so stop said car, and by reason of such failure to stop, the collision ensued which resulted in the death of White, then the plaintiff is entitled to a verdict in her favor, provided, of course, that you find from the evidence that plaintiff was the wife of said Edward White at the time of his death.''

Defendant's allowed instructions were very full and very fair, covering every phase of the defense. Being refused three instructions, defendant saved exceptions, but (as the matter appears to us) counsel do not now predicate error of such refused instructions; hence, they may be omitted.

On this record, the following assignments of error are leaned on by defendant's learned counsel:    (1)

That the court erred in its disposition of the motion to elect; (2) again in not giving defendant's peremptory. instruction; (3) and again in giving instruction numbered 1 on the prayer of plaintiff, and instruction numbered 3 on its own motion.

Of these in order.

I. Did the court err in overruling the motion to elect? We think not, because:

(a). No exception to the ruling on this motion at a prior term was preserved by a term bill of exceptions and presented here. The ruling sought to be reviewed was at the trial and made on counsel's suggestion, *ore tenus,* that they "renewed" the old motion. Our Code of Civil Procedure contemplates that pleadings should be in writing. This included demurrers and motions of like character. [R. S. 1899, secs. 599, 603, 612, 613, 619, 640, 641; Paddock v. Somes, 102 Mo. l. c. 235.] The old motion had served its purpose—was *functus officio.* The case had progressed beyond that, and if defendant desired to revive this motion, once acted on and exhausted, it should have put life and mettle into it by refiling it. Otherwise, the motion itself could not get into a bill of exceptions, made up of proceedings at the trial term. So that, even on this narrow and technical ground the ruling of the court will do.

(b). Again (and on broader grounds) it will be seen that the motion is based on the theory that plaintiff should have been held to elect because the allegations in the petition are "contradictory, inconsistent and one destroys another." Paragraph two of the motion is but an amplification of the foregoing generalizations and points out, *arguendo,* that if the rate of speed caused the injuries, then they could not have been caused by the failure to stop the car in the shortest time and space possible at the first appearance of danger; and *vice versa.* That motion, therefore, alone struck at inconsistency and contradiction—that is, that one ground of recovery destroyed the other, that all

plaintiff's theories could not exist and be true at one and the same time, thus bringing the petition within the maxim, *allegans contraria non est audiendus.*.

But an answer to this contention is that, having specified the grounds of the motion, defendant is precluded from urging any ground not specified; for section 640, Revised Statutes 1899, provides that: "All motions shall be accompanied by a written specification of the reasons upon which they are founded; and no reason not so specified shall be urged in support of the motion," and it must be apparent on the face of things that the averments in plaintiff's petition charging negligence (whatever may be otherwise said of them) are not inconsistent — do not make a *felo de se.* All of them could be true at one and the same time. The gist of the specifications of negligence was that deceased was killed through defendant's fault, in, first, running in excess of ordinance speed, and, second, in not stopping the car when a stop was called for and could have been made—both of which could be literally true together. For instance, if the car had been running at eight miles an hour, deceased might have got over the track and gone safely on his way. So, too, if the car had been stopped, deceased would not have been killed. If plaintiff had pleaded that the car was negligently running so fast that it couldn't be stopped, then it might be that the only real ground of complaint would be in the fast running, rather than in slow stopping, and some inconsistency might creep in, if the pleader relied on both fast running and slow stopping for recovery; but no such condition exists in this case. Hence, the motion cannot be allowed under the doctrine of Behen v. Railroad, 186 Mo. 430, relied on by defendant, and the court's ruling can be sustained on the theory there was no contradiction or inconsistency in the allegations of the petition.

(c). But the foregoing does not entirely and fairly dispose of the insistence of defendant's learned

counsel—made outside of the strict grounds of the motion, but still made and raising a question of practice that should be set at rest. They argue that the petition in one count commingles common law and ordinance negligence, and, therefore, the motion to elect was well enough under McHugh v. Railroad, 190 Mo. 85, and the later case of Clancy v. Railroad, 192 Mo. l. c. 640. What was said in the Clancy case was in paragraph one of the opinion, and that paragraph was not concurred in by the court. (P. 658.) In the McHugh case, however, the insistence of defendant was apparently allowed. But presently the Court in Banc confronted the same proposition in Rapp v. Railroad, 190 Mo. l. c. 153. The Rapp case met the approval of six judges, and, through BRACE, C. J., we there said this:

"At the inception of the trial the defendant moved the court to require the plaintiff to elect on which one of the causes of action stated in the petition he will stand, upon the grounds: 'First, that said petition attempts to combine in one count both alleged common law negligence and the alleged violation of an ordinance commonly called the Vigilant Watch ordinance; second, said petition attempts to combine in one count a cause of action *ex contractu* and a cause of action *ex delicto*' and in the course of the trial the plaintiff was permitted to introduce said ordinance in evidence over the objections of the defendant. The overruling of the motion to elect, and the admission of the ordinance in evidence, are assigned as errors. These assignments of error were argued and considered in the case of Sluder v. Railroad, 189 Mo. 107, in which the whole question is exhaustively treated in the opinions in that case, delivered at the last sitting of the Court in Banc on the first of June, 1905 — and in which the ruling was adverse to the contention of defendant. Hence, we hold in this, as we did in that case, which is on all-fours with this on these points, and for the reasons stated in the majority opinion therein, that the court

committed no error in overruling the motion to elect, nor in admitting the ordinance in evidence.''

In a very late case, Haley v. Railroad, 197 Mo. l. c. 23, VALLIANT, J., used this language for the Court in Banc; and it met the approval of a majority of my brothers:

''If the supposed ordinance had been in existence the plaintiff would have had the right to plead it as he did and to plead also that the train was running at a rate of speed which, under the circumstances, amounted to negligence at common law, because the facts stated as constituting a violation of the ordinance might be true and those stated as constituting common law negligence might also be true. Several acts of negligence of the same nature, and all of which may be true and either of which or all of which together may have caused the accident, may be pleaded in one count.''

Furthermore, it will be found that, barring inconsistent and self-destructive averments, there have been presented to this court in the last half century hundreds of cases' in which common law negligence and negligence made so by statute (or by some by-law of a city) have been pleaded in the same count and recovery has been allowed on proof of all or one or more of these specifications; and we cannot see why the different elements which blend together to produce the injury (so long as there is no discord between them) may not be so pleaded. The uniform practice has been to so plead them; no injury results therefrom to defendant that we can see; and there is no more confusion in blending them in one count than would come in setting out each specification of negligence in a separate count.

It may be said, then, that whether the negligence complained of arises from the violation of a common law duty, or a statutory duty, or an ordinance duty, is of no significance (that is, the mere *origin* of the

duty violated is of no significance) so long as the violated duties produce the one injury and the one damage constituting the subject-matter of the suit. There was no error in overruling the motion because it commingled ordinance and common law negligence.

(d). But further, there is no merit in the assignment of error now in hand, because there was only one ground of negligence put to the jury. That is to say, conceding the Vigilant Watch ordinance at root is merely declarative of the common law (which view we adopted in Deschner v. Railroad, 200 Mo. 310; see, also, Hovarka v. Railroad, 191 Mo. 1. c. 454), and, therefore, conceding that a violation of that ordinance is, in effect, a violation of a common law duty, yet it will be seen the case was put to the jury on the sole theory that defendant was liable only if by due care and diligence it could have stopped its car in time to have avoided the injury of deceased after he appeared to be in danger — the other theory, to-wit, the speed ordinance theory, being eliminated from the case by the instruction of the court. Hence, no injury could come to defendant from the presence in the petition of elements of negligence eliminated by instruction.

(e). Moreover, the ruling on the motion was right, because, in the philosophy of the science of pleading, faults in a petition are waived (barring the two cardinal ones of stating no cause of action and lack of jurisdiction) whenever in the evolution of a lawsuit the case once advances to the stage of joinder of issue on the facts as pleaded. In effect, such joinder is a challenge on the facts and on the facts alone, is a notice that defendant accepts the gage of battle and pitches the battle on the facts and invokes the expense, chances and machinery of a trial on such issue. When, then, defendant, as here, refused to stand on its motion to elect, filed answer, went to trial and took the chances of winning or losing on an issue of fact,

202 Sup—36

it abandoned its motion to elect; for a motion to elect is of no more dignity and potency than a motion to make more specific and certain, than a demurrer, or a motion to strike out because of departure, or because of redundant, irrelevant or frivolous matter; and, therefore, I take it, if a defendant is held (as he is) to have waived his demurrer or his motion to strike out or his motion to make an allegation more specific by joining issue on the facts by answer, then, as like reason makes like law, he must, by the same token, be held to have waived his motion to elect by answering over except where the allegations are so contradictory as to be self destructive and, therefore, no cause of action is stated. [Jordan v. Railroad, *ante,* p. 418.]    It was expressly so ruled in Paddock v. Somes, 102 Mo. supra; and, by parity of reasoning, that case is sustained by a line of decisions; for example, Pickering v. Telegraph Co., 47 Mo. l. c. 460; Thompson v. School District, 71 Mo. l. c. 500; Scovill v. Glasner, 79 Mo. 449; Sauter v. Leveridge, 103 Mo. l. c. 621; West v. McMullen, 112 Mo. 409; Holt County v. Cannon, 114 Mo. l. c. 519; Hill v. Railroad, 121 Mo. 477; (s. c., 49 Mo. App. 520); Walker v. Railroad, 193 Mo. l. c. 472. And is sustained by the policy evidenced by our statutes (see secs. 598 and 602, R. S. 1899).

For the foregoing reasons defendant's first assignment of error is disallowed.

II.    Was plaintiff entitled to go to the jury? It is argued by defendant that the case should have been taken from the jury on two grounds: first, because there was no evidence of negligence; second, because deceased was guilty of contributory negligence as a matter of law.    But we cannot agree that either ground is sound.    The case was entitled to go to the jury on the evidence of plaintiff's expert that the car could have been stopped in 150 feet when going twenty miles an hour, and in forty feet in going eight miles an hour, because Mrs. Conway put the horses about on

the track when the car was 150 feet away. Miss Sanders' testimony was to the same effect. Only she put the car further away. Not only so, but Muldoon, the motorman, made a case entitling plaintiff to the judgment of the jury on the issue as to whether or not the car could have been stopped in time to have saved the life of Edward White. He said, in effect, that he saw the heads of the horses appear in Wash street when he was seventy-five feet west, that warned by the progress of the horses towards the track, he got his car within control and had reduced its speed to two or three miles an hour. He puts himself in the situation of having made this reduction in running, say, thirty-five or forty feet, and this without the aid of his reverse or without any sand on the track. He says, in effect, that with the car going at two or three miles an hour he then discovered that deceased was about to cross the track forty or fifty feet in advance of his car; and that he was unable to stop the car in running forty feet more with the aid of his reverse and sand. Was this so, or was it not so? Was it not for the jury to say whether, if the speed of his car had been reduced by five or six miles an hour in running thirty-five or forty feet by the use of the brake, it could not have been brought to a standstill within the next forty feet by the use of emergency appliances? Clearly so. The issue was for the jury, even on Muldoon's testimony.

On the contributory negligence of deceased, it may be said the evidence showed he negligently put himself in a position of peril; but his prior negligent assumption of a perilous position did not warrant defendant, who had notice of his peril, in running him down. Conceding such prior negligence of deceased, there still remained to defendant the duty to exercise ordinary care to prevent injuring him. [Rapp v. Railroad, supra; Riska v. Railroad, 180 Mo. 168; Scullin v. Railroad, 184 Mo. l. c. 707, and cases cited; Moore

v. Railroad, 194 Mo. 1; Eppstein v. Railroad, 197 Mo. 720.]

But, it is argued there were no elements of wilfulness, recklessness or wantonness in the conduct of Muldoon, hence, the contributory negligence of deceased must be held to be the proximate cause of his death and the case falls to the ground. It may be that Muldoon did not act wilfully, wantonly or recklessly. There is nothing in the case to show he did. But wilfulness, wantonness and recklessness are not indispensable elements upon which to base a right of action for the wrongful death of a person. If A wilfully kill B (barring self-defense or justifiable homicide) an action lies. So if D recklessly and wantonly kill C an action lies. So, too, if E negligently kill F an action lies. That we have now and then characterized negligence in given cases as tantamount to wantonness, recklessness and wilfulness, was intended, it would seem, as a mere form of characterization, as descriptive color—as epithets plastered on negligence in certain forms. It was never our intention to decide that an action would not lie where A negligently placed himself in a position of peril so far away from B, controlling the dangerous instrumentality, that B could have prevented A's injury by the exercise of ordinary care and did not exercise it. [Hinzeman v. Railroad, 182 Mo. l. c. 623, et seq.; Rapp v. Railroad, 190 Mo. l. c. 161, and cases cited; Eppstein v. Railroad, supra.]

III. There was no error in giving instructions 1 and 3. They are shown to be proper declarations of law under the facts of this record and follow approved precedents. [Sluder v. Railroad, 189 Mo. 107; Levin v. Railroad, 140 Mo. 624; Hovarka v. Railroad, 191 Mo. 441; Schmidt v. Railroad, 149 Mo. 269; Bunyan v. Railroad, 127 Mo. 12.]

The judgment, being right, is affirmed.

All concur, except *Woodson, J.*, not sitting.