LILLIAN B. HILLIS v. HOME OWNERS' LOAN CORPORATION, a Corporation, and LOUIS E. KOONTZ, Appellants, CARRIE ALLEN RICE, Defendant.—154 S. W. (2d) 761.

Division Two, September 25, 1941.

Rehearing Denied, October 25, 1941.

Motion to Transfer to Banc Overruled, October 25, 1941.

*Redick O'Bryan, Kenneth Teasdale* and *Vaughn C. Ball* for Home Owners' Loan Corporation and Louis E. Koontz.

602

*Mark D. Eagleton, James A. Waechter* and *Roberts P. Elam* for Lillian B. Hillis.

BOHLING, C.—Lillian B. Hillis instituted this action against Carrie Allen Rice, Louis E. Koontz and Home Owners' Loan Corporation, a corporation, for personal injuries suffered in an automobile collision, seeking a judgment of $25,000. The jury returned

a verdict absolving Mrs. Rice from liability but in favor of plaintiff and against the other defendants for $25,000. Plaintiff appealed from the judgment in favor of Mrs. Rice but now concedes there is no reversible error. Plaintiff's appeal (our docket No. 37,119), upon her request, has been dismissed. Louis E. Koontz and Home Owners' Loan Corporation, appeal, asserting error in the giving of instructions, the admission of evidence, the amount of the verdict, and jurisdiction to entertain a tort action against said Home Owners' Loan Corporation.

 I. Without pointing to any provisions of the act (48 Stats., p. 128 et seq., 12 U. S. C. A., p. 984 et seq., Sec. 1461 et seq.) of its creation bestowing immunity but for the stated purpose of preserving the point because the United States Supreme Court has not ruled the issue, defendant Home Owners' Loan Corporation contends that, because of its identity with the United States, it is immune from suit in tort. Prato v. Home Owners' Loan Corp. (Mass.), 24 Fed. Supp. 844; Henson v. Eichorn (Ill.), 24 Fed. Supp. 842; Dudley v. Home Owners' Loan Corp., 232 Mo. App. (Springfield) 1006, 125 S. W. (2d) 95, among others, so held. Hillis v. Rice (Mo. App. St. Louis), 151 S. W. (2d) 717, 719[1; 2], a companion case to the instant case, reached a different result. [Consult Mo. Const., Art. VI, Amend. 1884, Sec. 6.] Prato v. Home Owners' Loan Corp. (C. C. A.), 106 Fed. (2d) 128, upon the authority of *Keifer & Keifer v. Reconstruction Finance Corp. and Regional Agricultural Credit Corp. (1939), 306 U. S. 381, 83 L. Ed. 784, 59 Sup. Ct. 516, reversed the ruling in 24 Fed. Supp. 844.

The Home Owners' Loan Act provides for the creation of "a corporation to be known as the Home Owners' Loan Corporation, which shall be an instrumentality of the United States, which shall have authority to sue and to be sued in any court of competent jurisdiction, Federal or State . . . ." [48 Stat. 129, 12 U. S. C. A., p. 985,

---

*In denying the contention that Congress had not subjected Regional Agricultural Credit Corporations to suit "in tort," Keifer v. Reconstruction Finance Corp., made observations, among others, to the following effect: That legal irresponsibility of the United States was derived by implication; that, being a privileged position, it had been appropriately confined; that governmental immunity from suit had fallen into disfavor; that in spawning governmental corporations during the past two decades and securing the advantages of corporate functioning over conventional executive agencies, Congress had included authority to sue and to be sued; that Congress might endow a governmental corporation with the government's immunity but immunity did not follow merely because they do the government's work; that the question is: Has the government endowed the corporation with immunity?—i. e., immunity is not presumed; that the Reconstruction Finance Corporation, the parent of the Regional Agricultural Credit Corporation, had authority to sue and be sued, and that Congress had embarked upon a generous policy for suits against the government sounding in tort and well knew how to restrict its consent to suits sounding only in contract.

sec. 1463.] The transactions of the Home Owners' Loan Corporation are akin to those of private enterprises. Absent any attempted showing, as here, that Congress used the "sue and to be sued" clause in a restricted sense, appellant Home Owners' Loan Corporation's contention and the ruling in Dudley v. Home Owners' Loan Corporation should not prevail, because: ". . . it must be presumed that when Congress launched a governmental agency into the commercial world and endowed it with authority to 'sue or be sued,' that agency is not less amenable to judicial process than a private enterprise under like circumstances would be." Federal Housing Administration v. Burr (1940), 309 U. S. 242, 245, 84 L. Ed. 724, 60 Sup. Ct. 488, sustaining garnishment proceedings. Consult Reconstruction Finance Corporation v. J. G. Menihan Corp. (Feb. 3, 1941), 85 L. Ed. (Adv. Ops.) 458, 61 Sup. Ct. 485; Annotations, 83 L. Ed. 794, 814; 125 A. L. R. l. c. 814; 121 A. L. R. l. c. 123.

II. Respondent's Instruction No. 2, directing a verdict against appellants for primary negligence, was predicated upon findings, among others, in the conjunctive that appellant Koontz operated his automobile at an excessive and dangerous rate of speed; that appellant Koontz could have but negligently failed to slacken the speed of his automobile; and that appellant Koontz could have but negligently failed to turn or swerve his automobile. It is not controverted that appellant Koontz was acting within the scope of his employment for appellant Home Owners' Loan Corporation on the occasion in question.

(a) Appellants question the submissibility of respondent's case only with respect to Koontz's duty to slacken speed, and the statement of facts will be limited accordingly. The collision occurred sometime after eight o'clock on the morning of February 4, 1938, in St. Louis at the intersection of Gratoit, an east and west street, and Sixth streets, a north and south street. These streets are approximately thirty feet wide, paved with cobblestones and intersect at right angles. It had been drizzling and the streets were wet. Mrs. Rice was operating a Chrysler sedan, the property of herself and husband, west over the north side of Gratoit. Her husband occupied the front seat with her. On the rear seat, in order from the north, were plaintiff's husband, Lee Hillis, plaintiff and plaintiff's sister-in-law, Mrs. Millikan. Mr. Koontz was operating a Buick sedan north on Sixth street, which has a double street car track. The building lines on Gratoit and Sixth streets are ten feet back from the curb lines and sidewalks occupy the intervening space on the southeast and southwest corners of said intersection to the buildings erected on the building lines at each of said corners. The building on the southeast corner constituted some obstruction to the view. Mr. Koontz had been over the intersection frequently and was familiar with it. There was no traffic or parked cars to interfere with the movements

of the Chrysler or the Buick. There was testimony from which the jury could find that the Chrysler approached the. intersection at a speed estimated from ten to eighteen miles an hour; that when the front of the Chrysler reached the east building line of' Sixth street, occupants on the rear seat observed the Buick approaching along the northbound or east car track twenty to twenty-five feet south of the south curb line of Gratoit street; that the speed of the Chrysler was increased (Mrs. Rice testifying she was attempting to avoid a collision); that the Buick came on without slackening its speed or turning or swerving and the left corner of the Buick's bumper struck the left rear fender and bumper of the Chrysler in the northeast quadrant of the intersection, just east of the center of Sixth street and three or more feet north of the center of Gratoit street; and that the Chrysler would have cleared had it been a foot or two farther west. The impact threw the rear of the Chrysler to the north and it proceeded diagonally across the intersection, up over the curb at the southwest corner, and against the building thereat. The jolt of the Chrysler moving over the curb threw plaintiff from her seat and the injuries involved resulted. Appellant Koontz's testimony permitted of a finding that the Buick traveled thirty-eight feet after he first saw the Chrysler to the point of impact. Respondent's testimony extended the distance to a possible forty-three feet. Whether Koontz could have slackened the speed of the Buick so as to afford the Chrysler the few feet additional to clear the path of the Buick was for the jury. Consult Gann v. Chicago, R. I. & P. Ry. Co., 319 Mo. 214, 222, 227, 6 S. W. (2d) 39, 41, 43[4].

█ (b) Appellants say that respondent's theory of negligence based on excessive speed and respondent's theory of negligence based on a failure to slacken speed are inconsistent and self-destructive and the instruction was erroneous. Appellants stress Elliott v. Richardson (Mo. App.), 28 S. W. (2d) 408, 410[2, 3]; Tunget v. Cook (Mo. App.), 84 S. W. (2d) 970, certiorari quashed, State ex rel. Tunget v. Shain, 340 Mo. 434, 101 S. W. (2d) 1; Dilallo v. Lynch, 340 Mo. 82, 88, 101 S. W. (2d) 7, 10[4, 5]. These and other cases are discussed in Hillis v. Rice et al. (Mo. App.), 151 S. W. (2d) 717, 719-724; wherein a judgment in favor of the instant plaintiff's husband for damages resulting from the injuries here involved was affirmed, and we need not repeat what is there said. We are in accord with the rulings that one may not base a recovery on conflicting and self-destructive theories, but from the nature. of the issue a ruling ordinarily seeks the facts.

Appellants' reasoning that a finding under one of the specifications destroyed the other because negligent speed means going too fast to be able to stop in the available distance is in the teeth of Sec. 8383, R. S. 1939, Mo. Stat. Ann., p. 5197, Sec. 7775, which conditions a careful and prudent speed upon the time of the day, the traffic, the

condition of the highway, its location with reference to intersecting highways, et cetera. Consult also Davidson v. St. Louis-S. F. Ry. Co. (Mo.), 229 S. W. 786, 788[1].; Beal v. Chicago, B. & Q. Rd. Co. (Mo.), 285 S. W. 482, 485[3]; Montague v. Missouri & K. I. Ry. Co., 305 Mo. 269, 280(1), 264 S. W. 813, 816[2]. An excessive and dangerous speed does not become a careful and prudent speed merely because the operator of the automobile does not have an occasion to test his ability to stop to prevent an accident.

The "proximate cause" of an injury, in jurisprudence, is synonymous to "legal cause," and is not necessarily restricted to the cause last operating in time and space. It is akin, in logic, to what is called an "efficient cause." In personal injury actions it signifies the breach of a duty or duties to the person injured. Ordinarily a plaintiff may predicate a recovery on one or more or all of several proved concurrent breaches of duty owed by a defendant or defendants. What a defendant's conduct was is a question of fact. What a defendant's conduct should have been is a question of law. Koontz had the lawful right to properly operate his automobile on the highway. This right was not an unrestricted privilege (see, among others, Secs. 8383, 8385, R. S. 1939, Mo. Stat. Ann., pp. 5197, 5213, secs. 7775, 7777), but imposed upon him the correlative duties, so far as material here, to exercise due care to operate his automobile at a lawful rate of speed and, in addition, to slacken its speed to avoid the collision. Contributory negligence of a plaintiff defeating a recovery has no bearing on the issue and is not an issue in this case. Koontz's operation of his automobile at an excessive speed was the doing of a lawful act in an ▉ improper manner. Operating it, his failure to slacken its speed was an omission to perform a duty. The primary duty of the operator of an automobile to slacken speed so as not to endanger life, limb or property exists independently of whether the speed be lawful or excessive, although the ability to discharge the legal duty to slacken may be affected by the speed and the breach of the duty to slacken may become a consequence of the breach of the duty to operate at a careful and prudent speed. The primary duty to operate an automobile at a lawful speed and the primary duty to slacken its speed are not necessarily inconsistent. If Koontz, before or after the duty to slacken speed arose, operated his automobile at an excessive speed, such excessive speed did not become a lawful speed merely because he failed to slacken speed when the duty arose; and the mere fact that he was operating his automobile at an excessive speed would not relieve him from the performance of the primary duty to slacken owed by one operating at a lawful speed. Under the facts of the instant case, the jury was privileged to find an unbroken connection between Koontz's excessive speed and Koontz's failure to slacken speed in the chain of events

leading up to plaintiff's injuries and that each was a substantial concurring factor therein.*

The basic thought underlying the statements with respect to the theories of recovery being inconsistent in Dilallo v. Lynch, supra, as there pointed out and supported by the authorities cited, is the rule that a plaintiff may not take advantage of testimony contradictory to and at war with plaintiff's testimony and the fundamental theory of plaintiff's case. (See also State ex rel. v. Shain (Mo.), 125 S. W. (2d) 41, 43[2], and cases cited; Smithers v. Barker, 341 Mo. 1017, 1023[1], 111 S. W. (2d) 47, 50[1], and cases cited.) The remarks were directed to an instruction predicating a recovery on defendant's duty to stop or slacken speed under the humanitarian doctrine based on defendant's deposition that he was traveling eight to ten miles an hour, when Dilallo testified that he (Dilallo) was traveling twenty miles an hour and was pulling out to pass a parked cab when he saw defendant's automobile twenty or twenty-five feet away, approaching from behind another car over onto Dilallo's side of the highway at forty miles an hour. There was no testimony on which to predicate a recovery on defendant's ability to stop his car in the available distance when traveling forty miles an hour and, of course, plaintiff's testimony that defendant was traveling at forty miles an hour was irreconcilable with defendant's testimony that he was traveling eight to ten miles an hour and inconsistent with any theory, under the evidence available to plaintiff, that defendant could have stopped under the humanitarian doctrine. A plaintiff's failure to plead or to establish a factual ground of recovery, see also Crews v. Wilson, 312 Mo. 643, 651(II), 281 S. W. 44, 46(II), presents issues differing from instructions submitting self-destructive theories, and factual situations arising under the humanitarian doctrine are not to be confused with issues restricted to a defendant's primary negligence.

It is apparent from the opinion quashing our writ of certiorari to review the Court of Appeals' ruling in Tunget v. Cook, supra, that the facts set out in the record made by the Court of Appeals and to which we are confined in certiorari proceedings were too meager to disclose any conflict of rulings upon the same or a like state of facts.

(c) What we have said disposes of appellants' kindred contention that one or the other of appellants' refused instructions seeking to

---

*Consult Taylor v. Metropolitan St. Ry. Co., 256 Mo. 191, 210(II), 165 S. W. 327, 332(II); Montague v. Missouri & K. I. Ry. Co., 305 Mo. 269, 284(V, VI), 264 S. W. 813, 817[9, 10]; Rawie v. C., B. & Q. Rd. Co., 310 Mo. 72, 84(I), 274 S. W. 1031, 1034(I); Williams v. St. Louis Pub. Serv. Co., 335 Mo. 335, 345[9], 73 S. W. (2d) 199, 203[10]; Bumgardner v. St. Louis Pub. Serv. Co., 340 Mo. 521, 525(II), 102 S. W. (2d) 594, 597[5]; Haley v. Missouri Pac. Ry. Co. (Banc), 197 Mo. 15, 25, 93 S. W. 1120, 1123; White v. St. Louis, M. R. Rd. Co., 202 Mo. 539, 557(b), 101 S. W. 14, 20(b); Farrar v. Metropolitan St. Ry. Co., 249 Mo. 210, 217(I), 155 S. W. 439, 441(I).

withdraw from the jury one or the other of said asserted self-destructive grounds of recovery should have been given.

▇ III. Error is predicated upon the admission of the following testimony, elicited from appellant Koontz by counsel for defendant Rice: "Q. You know that it is the law of the State of Missouri that when two vehicles approach an intersection ▇ at approximately the same time, the vehicle to the right has the right of way? A. Yes, sir." Appellants then interposed a general objection, which the court overruled, and appellants excepted. Respondent says, among other things, that the issue is not for appellate review because there was no motion to strike or request that the jury disregard the testimony. Harrison v. St. Louis-S. F. Ry. Co., 339 Mo. 821, 828[1], 99 S. W. (2d) 841, 843[2]; and Wolfson v. Cohen (Mo.), 55 S. W. (2d) 677, 680[6], among others, sustain this position of respondent.

▇ IV. Appellants assign error in the court's refusal of their instruction predicating a verdict in their favor on certain hypothecated sole negligence of defendant Rice. We shall not detail the testimony. Koontz testified that the collision occurred north of the center line of Gratoit street; that he made no right turn onto Gratoit street; that "it wouldn't have been much of a trick to turn into Gratoit street;" that he only turned about a foot to the right; and that the Buick's bumper hit the left rear of the Chrysler. This testimony, not contradicted by other testimony, left no foundation on which to base a sole cause instruction; because had Koontz performed his duty by turning to the right (which admittedly he could have performed to the extent of turning right onto Gratoit) before the Buick crossed the center line of Gratoit and struck the Chrysler there would have been no collision, and this neglect of duty at least concurred in bringing about the collision. [Gould v. Chicago, B. & Q. Rd. Co., 315 Mo. 713, 726(VIII), 290 S. W. 135, 140[12]; Schuetter v. Enterprise Comm. Corp. (Mo. App.), 34 S. W. (2d) 976, 977[3]; Felts v. Spesia (Mo. App.), 61 S. W. (2d) 402, 405[5, 6].] We are in accord with what is said on this principle of law in Peppers v. St. Louis-S. F. Ry. Co., 316 Mo. 1104, 1113(IV), 295 S. W. 757, 761(IV). [See also Crews v. Kansas City Pub. Serv. Co., 341 Mo. 1090, 1101, 111 S. W. (2d) 54, 59[7].]

V. The amount of the damages.

Respondent was fifty-five at the time of the collision (February 4, 1938), and prior thereto had performed part of her housework and enjoyed very good health. After the accident she could not sit up, was taken to the City Hospital in an ambulance, and X-rays were made of her spine. They disclosed fractures of her first and second lumbar vertebrae, which were "telescoped, pressed together" with the de-

formity quite pronounced. Respondent was then taken to St. Mary's Hospital where, after treatment for shock, she was placed on a hyper-extension apparatus, a double inclined plane, so arranged that the angle could be increased a little each day, with the head and feet lower than the spine, in an effort to pull the spine back into normal alignment. She remained on the fracture bed until May 1, and on May 7, 1938, went home, to Columbia, Missouri, in the rear of an automobile. X-rays taken on April 4, 1938, showed the former fractures, the compressions, the bulging of the bones, but that the vertebrae had recovered some of their former shape and a small outgrowth of bone—nature's healing process. A form-fitting celluloid jacket, extending from high on respondent's chest to low on her hips, had been made to immobilize her spine. It fitted like a "vise," preventing her from leaning forward or backward. She continuously wore this after leaving the hospital, on advice of her physician, until December, 1938. When she took the jacket off she found she felt weak and at nights continued its use until June, 1939, and thereafter the use of pillows at her back and at each elbow to relieve the pain.

Respondent testified that at the time of the trial (October 9, 1939) she was conscious of a dull ache and pain in her back; that this would increase upon movement or excitement; that she took aspirin; that she had experienced nervousness, sleeplessness, general weakness and had suffered from shingles and high blood pressure; that when using stairs, she would support herself on the banisters; that when she walked around the yard a little, she would become weak, and since June, 1939, had spent half of her time "down." Cross-examination developed that when respondent came to St. Louis in June, 1939, she made a week's trip down the Mississippi, which she thought had been beneficial; and she testified that she had been gradually showing improvement.

Dr. Olney A. Ambrose testified that respondent's second lumbar vertebrae was crushed fifty per cent, and the first lumbar about twenty-five per cent; that the discs between the two vertebrae had been apparently obliterated and were being absorbed; that the soft structure, muscles and ligaments, had been damaged and respondent's spine was rigid from the border of the lower rib to well down in the back, and that respondent's condition was fixed and permanent and would cause pain and discomfort for a long time to come, especially upon movement.

Dr. Warren G. Marston attended respondent. He recalled no injuries other than to the two vertebrae. Respondent also consulted him in October, 1938, and June, 1939. His examination in June, 1939, showed the fractures completely healed in that no further surgical interference was needed.

In Kieffer v. St. Joseph (Mo. 1922), 243 S. W. 104, a judgment for $15,000 was reduced to $10,000. Kieffer, a carpenter by trade, suf-

fered a compression of the first lumbar vertebrae of approximately one-half inch, resulting in partial paralysis of lower limbs and partial, if not complete paralysis, of the bladder and rectum, and paralysis of sensation in back part of hips and back part of limbs. He was unable to control his elimination. He had suffered continuously. There was testimony that his condition would not improve. Carpenter wages were forty-five to fifty cents an hour at the time of the injury and had increased to eighty-seven and one-half cents at the time of trial.

In Mount v. Western Coal & Mining Co. (1922), 294 Mo. 603, 614(III), 242 S. W. 943, 946[8], a coal miner, earning $5 a day when working, suffered a fracture of the spinous processes of the eleventh and twelfth dorsal vertebrae. He suffered much pain and still suffered and would continue to suffer some. His use of his legs was impaired and he was unable to get about, except with the aid of crutches. He was more or less permanently disabled for life and likely could not resume his trade. Judgment for $20,000 was ordered reduced to $15,000. [Consult also Looff v. Kansas City Rys. Co. (Mo. 1922), 246 S. W. 578; Reynolds v. St. Louis Transit Co. (1905), 189 Mo. 408, 88 S. W. 50; Page v. Payne, 293 Mo. 600, 240 S. W. 156.]

Respondent cites Vitale v. Duerbeck, 338 Mo. 556, 568[5], 92 S. W. (2d) 691, 695[9], and Potashnick v. Pearline (Mo.), 43 S. W. (2d) 790, 793[8], affirming judgments for $30,000 and $25,000, respectively. These cases disclose more serious injuries than the instant record.

If respondent will remit, within ten days, $7000, the judgment will be affirmed for $18,000 as of the date of original rendition. Otherwise, the cause is reversed and remanded for new trial.

Plaintiff's appeal is dismissed, and the judgment against the appellants-defendants is affirmed conditionally *Cooley* and *Westhues*, *CC.*, concur.

PER CURIAM:—The foregoing opinion by BOHLING, C., is adopted as the opinion of the court. All the judges concur.