**NATIONAL HOUSING AGENCY et al. v. ORTON.**

**No. 4414.**

Court of Civil Appeals of Texas. Beaumont.
April 25, 1947.

Rehearing Denied May 14, 1947.

King & Rienstra, of Beaumont, for appellants.

Adams & Daughtry, of Beaumont, for appellee.

WALKER, Justice.

William T. Orton brought this action against certain agencies of the United States Government to recover damages for personal injuries sustained by him as a result of his falling, on or about November 25, 1943, upon certain steps attached to a men's dormitory in Orange, Texas. He alleged that defendants operated this dormitory. He named as defendants the National Housing Agency and its Administrator, the Federal Public Housing Authority and its Commissioner, and the United States Housing Authority and its Administrator. He alleged that the titles "Federal Public Housing Authority" and "United States Housing Authority" referred to and identified the same agency, to-wit, the corporation known originally as United States Housing Authority, and that National Housing Agency has supervisory control over this corporation. He alleged further that he was employed as a guard at this dormitory by these agencies, or by one of them, and was engaged in performing his duties as a guard at the time he was injured, and that his injuries were the proximate result of defendants' negligence in failing to have the steps properly lighted and in a safe condition when he fell.

The cause was tried to a jury and on their verdict (convicting FPHA and its Commissioner of negligence as pleaded, and acquitting plaintiff of contributory negligence) and on various stipulations, findings and conclusions the trial court rendered a judgment dated April 26, 1946, for $9,500 in plaintiff's behalf against United States Housing Authority and its Administrator and Federal Public Housing Authority and its Commissioner, but plaintiff took nothing against the National Housing Agency and its Administrator. The trial court sustained plaintiff's contention that Federal Public Housing Authority was the same agency as United States Housing Authority, and the judgment, in so far as it runs against United States Housing Authority is based upon this conclusion. The defendants against whom judgment was rendered (which, under the trial court's conclusion, represent a single corporation and its chief executive officer; in his official capacity only) have appealed.

It appears from the record that plaintiff served as a guard, or night watchman, from December 8, 1942, until October 5, 1944, at a large men's dormitory in Orange, Texas, adjacent to the shipyard operated by Consolidated Steel Corporation. During the night of November 25, 1943, as he walked down an unlighted flight of steps forming a part of an entrance to this dormitory, one of the treads in these steps (the third from the top of the flight) tilted, or turned under his foot, and caused him to fall suddenly and heavily to the ground and against the steps. These steps were made of wood, and the nails connecting this tread to its supporting timber were loose and thus the tread, itself, was loose. Plaintiff was engaged in the performance of his duties at the time, and the jury found that he sustained personal in-

juries as a result of this fall and assessed his damages at $9,500. Plaintiff was forced to terminate his employment on October 5, 1944, by reason of a paralytic condition which had become much worse at the time this cause was tried (he was almost helpless); and it was the theory of plaintiff's medical witnesses that plaintiff's fall on November 25, 1943, affected plaintiff's spinal column and spinal cord and thereby produced this paralysis. These witnesses testified that plaintiff's condition would steadily grow worse and that it would shortly cause plaintiff's death. It was appellants' theory that plaintiff's condition resulted from a scuffle which plaintiff had with a tenant of the dormitory during the night of August 31, 1944, a little over a month before plaintiff left his employment; but there was ample testimony to the contrary from plaintiff's witnesses, and the jury found that plaintiff's condition was not caused solely by the incident of August 31, 1944.

The jury found that Federal Public Housing Authority (referred to hereinafter as FPHA) and its Commissioner were guilty of negligence, as follows, proximately causing plaintiff's fall and injuries: (1) In permitting the nails, which attached the tread (causing plaintiff's fall) to its supporting timber, to become loose; (2) in failing to use ordinary care to inspect these steps prior to plaintiff's fall, to determine whether the steps were safe; (3) and in failing to replace the electric bulb, before plaintiff fell, which had illuminated these steps but which had burned out several days before plaintiff's fall.

The jury found further: (1) That plaintiff had no actual knowledge prior to his fall that the particular tread was loose; (2) that his exercise of reasonable and ordinary care and observation in the performance of his duties would not have necessarily informed him, before he fell, that this tread was loose; (3) that plaintiff was not negligent in failing to discover the defective condition of the steps, or in failing to replace the burned out electric bulb; (4) that plaintiff did not fail to keep a proper lookout where he was walking, at and immediately prior to his fall; and (5) that plaintiff's fall and resulting injuries were not due solely to an unavoidable accident.

None of the jury's findings referred to United States Housing Authority (hereinafter referred to as USHA) and as we have stated, the trial court's judgment against that agency necessarily depends upon the trial court's conclusion that FPHA was one and the same agency as USHA. The validity of that conclusion depends upon the sufficiency of the evidence to show, as a matter of law, that these two titles referred to the same agency.

The record shows further that the dormitory where plaintiff worked consisted of several large wooden structures housing men who worked in Orange. Nearly all of these men seem to have worked in shipyards, and there is some evidence that most of them worked at the shipyard operated by Consolidated Steel Corporation. There is also some evidence that Consolidated built naval vessels of various types, but the evidence does not show what sort of vessels were made elsewhere in Orange, nor (except as to two or three men who testified) does it show what kind of work the tenants did. However, only men who worked at these yards or at some other establishment engaged in work for the United States Government could secure rooms at this dormitory, and it seems a reasonable inference that rooms in this dormitory were available only to men engaged in National Defense Work. The relevant testimony is not wholly consistent; we refer to testimony given by plaintiff, by James Clifford Burrows, and by M. O. Bennett. The steps entrance to the south wing of Unit A of the dormitory. This dormitory was erected by on which plaintiff fell formed a part of the Farm Security Administration (referred to hereinafter as FSA) from appropriations made by various Acts of Congress, to-wit, the Urgent Deficiency Appropriations Act of 1941, 55 Stat. 14, the Additional Urgent Deficiency Appropriations Act of 1941, 55 Stat. 197, and the Third Supplemental National Deficiency Appropriations Act of 1942, 55 Stat. 810, being Public Laws 9, 73 and 353, enacted by the 77th Congress. These statutes authorized the President, through such agencies of the United States Government as he might select, to provide temporary housing, by construction of buildings or otherwise, in localities where

national defense activities had caused a shortage of housing and it must be assumed that FSA erected this dormitory at Orange under authority so to do, duly conferred by the President under the statutes just listed.

FSA designated this dormitory as DHTX 40 (it was subsequently, at some unstated time, designated as War Housing Project Tex—41075) and began construction on April 8, 1941. The dormitory was completed on June 13, 1941. FSA operated this dormitory until that agency transferred the operation of the dormitory to FPHA, and it must be inferred that if plaintiff was not always employed by FPHA (from December 8, 1942 until October 5, 1944) he was first employed by FSA and was transferred to FPHA at or about the time the operation of the dormitory was transferred to FPHA. However, plaintiff's testimony exhibits some uncertainty regarding the identity of plaintiff's first employer. Plaintiff was under the impression, when he began work as a guard on December 8, 1942, that he was an employee of Farm *Works* Administration and that he continued so to be for a period of two or three months and then became an employee of FPHA. Since the only agencies of the United States Government which ever had anything to do with the operation of the dormitory were FSA and FPHA, plaintiff doubtless erred in assuming that he ever worked for any agency other than these two. The significant fact, however, on this appeal is the fact that plaintiff was actually an employee of FPHA when he was injured. This fact, otherwise shown by the evidence, is established by the jury's finding in response to special issue No. 3, which with the jury's finding reads: "Do you find, from the preponderance of the evidence, that the plaintiff Orton, at the time he fell on said steps (if he did fall), was engaged in the due course of his employment as a night guard for the defendant, Federal Public Housing Authority and its commissioner in his official capacity? Answer 'Yes' or 'No' To which the jury answered: 'Yes.'"

The record does not show precisely when FSA transferred the administration of the dormitory to FPHA. The FPHA was created by Executive Order 9070, dated February 24, 1942, 50 U.S.C.A. Appendix, § 601 note, and the parties have stipulated "that jurisdiction of (the dormitory) was transferred directly from Farm Security Administration to the Federal Public Housing Authority pursuant to—Executive Order 9070 prior to November 1, 1943," and have stipulated further that "from prior to said date of November 1, 1943, and until July 1945 said (dormitory) was operated by the Federal Public Housing Authority pursuant to—Executive Order 9070." Plaintiff's testimony regarding the identity of his employer would indicate that the transfer occurred some two or three months after December 8, 1942, but the jury's findings respecting negligence and proximate cause have not been attacked and the stipulation of the parties is sufficiently definite.

We have not undertaken to determine the status (as of the time the plaintiff fell upon the steps) of the title to the dormitory and to whatever interest the United States originally had in the land on which the dormitory stood. Since FSA erected the dormitory under the Defense Housing Appropriation Acts, and since, as we shall show, the FSA was only a conventional executive agency of the United States Government, whatever property interest the United States had in that structure and in that land doubtless vested originally in the United States, as distinguished from some corporate agency of the United States. The parties have stipulated that FSA transferred "jurisdiction" of the dormitory to FPHA "pursuant to the provisions of— Executive Order 9070." We are not certain regarding the ultimate and complete effect to be given such a transfer as the parties say FSA made to FPHA. However, that transfer at least vested FPHA with possession and control of the dormitory and with the duty of operating the dormitory, and since plaintiff was an employee of FPHA, we think it of no special significance where the title to the property lay. For the evidence shows that FPHA assumed to repair the structure from time to time and had various employees charged with the duty of maintaining and keeping the dormitory in repair; and we think it a necessary conclusion from all of the relevant evidence that FPHA had the right and the duty as well to repair the dormitory.

We note especially the jury's finding in response to Issue 13 and the testimony of J. F. Sanford, Clovis A. Morgan, Ross D. Evahn and Mrs. Eva McDonnell. Issue 13 and the jury's finding read: "Do you find, from the preponderance of the evidence, that prior to and continuously up to the time of plaintiff Orton's fall on said steps (if he did fall), the defendant Federal Public Housing Authority and its commissioner had employed and authorized one Hill to keep and maintain their said barracks or men's dormitory and all appurtenances thereto, including said steps, in a reasonably safe condition? Answer 'Yes' or 'No'. To which the jury answered: 'Yes.' "

No special significance need be given plaintiff's testimony that he was paid by checks drawn on the United States Treasury which did not identify the agency employing him, nor to the testimony of M. O. Bennett, who had resided at the dormitory, that his checks for the rental due on his room at the dormitory were made payable to the United States Treasury. This testimony is consistent with the argument of either party, for we have no information regarding the practices of the United States Treasury and we note that under § 1421 (a), Title 42 U.S.C.A., the United States Housing Authority was authorized to deposit its funds in the Treasury, and any appropriation transferred to FPHA (USHA) under Executive Order 9070 doubtless remained on deposit in the Treasury.

We have referred to Farm Administration and to United States Housing Authority, and the contentions of the parties require a brief statement regarding the history and nature of these two agencies.

FSA is described in Herren v. Farm Security Administration, 8 Cir. 153 F.2d 76, 77, as follows (and we take this to be the status of FSA when Executive Order 9070 was made):

"The Farm Security Administration, initially called the Resettlement Administration, was established by Executive Order No. 7027, dated April 30, 1935, as amended by Executive Order No. 7200, dated September 26, 1935, pursuant to the authority of section 4 of the Emergency Relief Appropriation Act of 1935, 49 Stat. 115, 118. This section of the statute simply provided that 'In carrying out the provisions of this joint resolution the President is authorized to establish and prescribe the duties and functions of necessary agencies within the Government.'

"It cannot be said that the statute endowed the Farm Security Administration with any automatic or implicit entityship, and the executive order by which it was created does not purport to give it an entitive status. It was constituted as a mere organ, bureau, or agency of the executive branch, without legal entityship, to assist in administering rural relief and furthering rehabilitation. Such contracts as it was authorized to make were accordingly not obligations on its own part entitively, but, if they were legal obligations, as the statute and the executive order certainly must have intended them to be, they were and could only be in fact obligations on the part of the United States using the name Farm Security Administration for administrative and identificatory convenience. In legal nature and effect they would be no different than contracts made, for instance, by the War Department or by any other nonentitive executive organ, bureau, or agency, in its own name but with the United States as the actual contracting party."

It appears from the note following Title 7 U.S.C.A. § 1001, that this agency was abolished by the Act of August 14, 1946, § 2, 7 U.S.C.A. § 1001 note, as were "all functions, powers, and duties of the National Housing Agency with respect to property, funds, and other assets which were formerly under the administration or supervision of the Farm Security Administration and were transferred to or consolidated with the National Housing Agency by Executive Order Numbered 9070 of February 24, 1942, *except* housing projects and except such other properties and assets as are now in the process of liquidation."

It may be assumed, without so deciding, that a suit against FSA was in effect a suit against the United States and that Congress had not consented that this suit might be maintained against FSA.

USHA is a corporate agency and not a conventional executive agency of the Unit-

ed States Government.. It was created by the United States Housing Act of 1937, being title 42 U.S.C.A. §§ 1401 to 1430, inclusive, for purposes which may be broadly described as the elimination of slums through the erection of low rent housing establishments. It financed such projects not only by loans but also by grants of capital and apparently, from time to time, had projects under its administration which were somewhat like the dormitory where plaintiff worked.

Article 1403, subsection (a), provides: "There is hereby created in the Department of the Interior and under the general supervision of the Secretary thereof a a body corporate of perpetual duration to be known as the United States Housing Authority, which shall be an agency and instrumentality of the United States. And Article 1417 provides: "The Authority shall have a capital stock of $1,000,000, which shall be subscribed by the United States and paid by the Secretary of the Treasury out of any available funds. Receipts for such payment shall be issued to the Secretary of the Treasury by the Authority and shall evidence the stock ownership of the United States of America."

It is provided in subsection (b) of Article 1403 that "That powers of the Authority shall be vested in and exercised by an Administrator, who shall be appointed by the President, by and with the advice and consent of the Senate." And in Article 1405, subsection (a), it is provided that: "The principal office of the Authority shall be in the District of Columbia, but it may establish branch offices or agencies in any State, and may exercise any of its powers at any place within the United States. The Authority may, by one or more of its officers or employees or by such agents or agencies as it may designate, conduct hearings or negotiations at any place."

Under Section 301 of Reorganization Plan No. 1, effective July 1, 1939 (see note following Title 5 U.S.C.A. § 133t), the USHA and its functions and personnel, including the Administrator, were transferred from the Department of the Interior to the Federal Works Agency, which was created by said Plan No. 1; and it was provided in Section 304 of Plan No. 1 that the Authority and its functions should be administered by its Administrator under the direction and supervision of the Federal Works Administrator, the chief executive officer of the Federal Works Agency, to whom was transferred the functions relating to the administration of USHA which had previously been exercised by the Secretary of the Interior. This was the status of USHA at the time Executive Order 9070 was made, and we shall refer in more detail to USHA in our subsequent discussion of Executive Order 9070.

We proceed to a discussion of appellants' Points of Error.

Under Points 1 to 4, inclusive, and Points 8 to 12, inclusive, appellants make the following argument for reversal of the trial court's judgment: (a) FPHA and USHA are *not* one and the same agency but are different agencies of the United States Government. (b) There is nothing in the record to show that USHA ever had anything to do with the dormitory where plaintiff was injured. (c) FPHA, the employer of plaintiff and the agency which did operate the dormitory, was not a corporate entity but instead was only a conventional executive agency of the United States Government, and this suit against FPHA is in effect nothing but a suit against the United States. The suit should therefore have been dismissed because Congress has not consented that it may be maintained against the United States. They also make some point of the fact that FSA, a conventional and supposedly nonsuable executive agency of the Federal Government, erected and first operated the dormitory.

We note the following questions:

I. Is FPHA one and the same agency as United States Housing Authority? This is the premise upon which appellants' argument depends. We hold that from this record it appears as a matter of law that USHA and FPHA constitute one and the same agency.

FPHA is one of the three constituent units of National Housing Authority (referred to hereinafter as NHA) and was created, as was NHA, by Executive Order 9070, dated February 24, 1942. Executive

Order 9070 was made under and by virtue of the First War Powers Act of December 18, 1941, being Title 50 U.S.C.A.Appendix, §§ 601–622, inclusive.

Section 601, Title 50 U.S.C.A.Appendix, provides:

"For the national security and defense, for the successful prosecution of the war, for the support and maintenance of the Army and Navy, for the better utilization of resources and industries, and for the more effective exercise and more efficient administration by the President of his powers as Commander in Chief of the Army and Navy, the President is hereby authorized to make such redistribution of functions among executive agencies as he may deem necessary, including any functions, duties, and powers hitherto by law conferred upon any executive department, commission, bureau, agency, governmental corporation, office, or officer, in such manner as in his judgment shall seem best fitted to carry out the purposes of this title, and to this end is authorized to make such regulations and to issue such orders as he may deem necessary, which regulations and orders shall be in writing and shall be published in accordance with the Federal Register Act of 1935, [44 U.S.C.A. § 301 et seq.]: Provided, That the termination of this title shall not affect any act done or any right or obligation accruing or accrued pursuant to this title and during the time that this title is in force: Provided further, That the authority by this title granted shall be exercised only in matters relating to the conduct of the present war: Provided further, That no redistribution of functions shall provide for the transfer, consolidation, or abolition of the whole or any part of the General Accounting Office or of all or any part of its functions."

Section 602, Title 50 U.S.C.A.Appendix, reads:

"In carrying out the purposes of this title the President is authorized to utilize, coordinate, or consolidate any executive or administrative commissions, bureaus, agencies, governmental corporations, offices, or officers now existing by law, to transfer any duties or powers from one existing department, commission, bureau, agency, governmental corporation, office, or officer to an-

other, to transfer the personnel thereof or any part of it either by detail or assignment, together with the whole or any part of the records and public property belonging thereto."

Section 603, Title 50 U.S.C.A.Appendix, reads:

"For the purpose of carrying out the provisions of this title, any moneys heretofore and hereafter appropriated for the use of any executive department, commission, bureau, agency, governmental corporation, office, or officer shall be expended only for the purposes for which it was appropriated under the direction of such other agency as may be directed by the President hereunder to perform and execute said functions, except to the extent hereafter authorized by the Congress in appropriation Acts or otherwise."

Section 605, Title 50 U.S.C.A.Appendix, reads:

"All laws or parts of laws conflicting with the provisions of this title are to the extent of such conflict suspended while this title is in force.

"Upon the termination of this title all executive or administrative agencies, governmental corporations, departments, commissions, bureaus, offices, or officers shall exercise the same functions, duties, and powers as heretofore or as hereafter by law may be provided, any authorization of the President under this title to the contrary notwithstanding."

Executive Order 9070 is copied in full among the notes following Title 50 U.S. C.A.Appendix § 601, and will not be repeated here. This Order reorganized the administration of many housing functions performed by the United States Government by consolidating in one bureau, styled National Housing Agency, various agencies of the Government, executive and corporate as well, and various functions and duties performed by other agencies (which, deprived of these functions and duties, remained independent of NHA). This Order was to remain in force (and thus the scheme of organization prescribed therein was to remain in force) only so long as the provisions quoted above from the First War Powers Act remained in force.

Paragraph I of the Order lists the various agencies, functions, duties, and powers which were consolidated in NHA, including the following: "(e) The United States Housing Authority and its functions, powers, and duties, including those of the Administrator thereof. (f) All functions, powers and duties relating to defense housing of * * * (3) any agencies heretofore designated (including the Federal Works Agency and the Farm Security Administration) to provide temporary shelter in defense areas under the Urgent Deficiency Appropriation Act, 1941, and the Additional Urgent Deficiency Appropriation Act, 1941, and the Third Supplemental National Defense Appropriation Act, 1942." Subparagraph (f) (3) includes the dormitory at Orange where plaintiff worked.

Section 2 of the Order provides for the appointment of the chief executive officer of NHA, who is given the title National Housing Administrator.

Section 3 of the Order is of the most immediate significance here. It establishes and names the three constituent units of NHA, and we quote it in full as follows (italicizing the most important provisions).

"3. There shall be three main constituent units in the National Housing Agency. Each such unit shall be administered by a commissioner acting under the direction and supervision of the National Housing Administrator. The unit administering the Federal Housing Administration and its functions, powers, and duties shall be known as the Federal Housing Administration, and the Federal Housing Administrator shall serve as Federal Housing Commissioner. The unit administering the functions, powers, and duties of the Federal Home Loan Bank Board and its members shall be known as the Federal Home Loan Bank Administration, and the Chairman of the Federal Home Loan Bank Board shall serve as Federal Home Loan Bank Commissioner. *The United States Housing Authority and its functions, powers, and duties shall be administered as the Federal Public Housing Authority, one of the main constituent units, and the Administrator of the United States Housing Authority shall serve as Federal Public Housing Commissioner.*

*The agencies, functions, powers, and duties enumerated in* sub-paragraphs (c), (d), and (k) of paragraph 1 shall be administered in the Federal Home Loan Bank Administration, and those enumerated in *sub-paragraphs (f) and (g) shall be administered in the Federal Public Housing Authority. The agency, functions, powers, and duties enumerated in sub-paragraph (h) of paragraph 1 shall also be administered by the Federal Public Housing Commissioner.* The Administrator of the National Housing Agency may centralize in the office of the National Housing Administrator such budget, personnel, legal, procurement, research, planning, or other administrative services or functions common to the said constituent units as he may determine."

Other paragraphs of the Order transfer personnel, property and appropriations which were attached to the various agencies, functions, duties and powers consolidated in NHA. We need not consider those provisions, for appellants do not deny their liability, if they are subject to the rules of substantive law governing the liability of private parties.

Our determination, whether FPHA is the same agency as USHA, is controlled by the provisions of paragraph 3 of Executive Order 9070, which we have underlined above. The language to which we refer means that FPHA is the same agency as USHA, for, to say that USHA is to "be administered *as*" FPHA is only another way of saying that USHA shall be *operated as* FPHA, and this necessarily means that FPHA is only another name for USHA.

The effect of this construction is but to show, in the main, the continued existence of the corporation and its temporary transfer into NHA from the Federal Works Agency (into which it had been transferred from the Department of the Interior), and to show that the National Housing Administrator was vested with supervisory powers formerly exercised by the Federal Works Administrator and, still earlier, by the Secretary of the Interior, Executive Order 9070, of course, delegated new functions to USHA and temporarily gave a

new title to USHA and one to its Administrator, but the corporation seems unchanged in substance.

There is some authority for our construction of Executive Order 9070. Congress placed the same construction on that Order in enacting the Government Corporation Control Act, of December 6, 1945, being Title 31 U.S.C.A. §§ 841 to 869, inclusive. The Act regulates both wholly owned and mixed ownership government corporations, and in Section 846, Title 31 U.S.C.A., the term "wholly owned Government corporation" is defined by listing the particular corporations which Congress intended to regulate by the statute. Among the "wholly owned Government corporations" so listed is the following: "Federal Public Housing Authority (or United States Housing Authority) and including Public Housing Projects financed from appropriated funds and operations thereof." This constitutes a positive recognition by Congress of three facts: (1) That FPHA is a corporation; (2) that FPHA and USHA are one and the same corporation (they necessarily must be, if FPHA is a wholly owned corporation, as Congress believed it to be); and (3) that FPHA (USHA) is administering certain public housing projects. These are the facts, of course, which plaintiff charges against appellants here and which appellants deny.

In addition to the Government Corporation Control Act, we note that in certain litigation, apparently under the control of the Washington office of the attorney general, FPHA has formally stipulated that it constitutes the same agency as USHA. See: Federal Public Housing Authority v. Guckenberger, 143 Ohio St. 251, 55 N.E.2d 265, by the Supreme Court of Ohio, reversed by the Supreme Court of the United States at 323 U.S. 329, 65 S.Ct. 280, 89 L.Ed. 274.

We have found only two other decisions involving NHA and FPHA, to-wit, New York Casualty Co. v. Zwerner, 58 F.Supp. 473, an opinion filed by the District Court for the Northern District of Illinois on an application for a temporary injunction, and City of Phœnix v. Superior Court of Maricopa County, 175 P.2d 811, by the Supreme Court of Arizona. Neither decision refers to Executive Order 9070, and since the fact situations before the courts in these cases differ from the fact situation before us, we think them not in point, although there is some language in the Arizona case which may not be consistent with our own conclusion.

II. Was the administration of the dormitory at Orange the conduct of the corporation FPHA (USHA), or of the bureau NHA (and thus, of the United States government)? Did the officers of FPHA act in a dual capacity, namely, for USHA in performing the statutory functions of that corporation, and for National Housing Agency (the United States government) in administering the projects, including the dormitory at Orange, which were transferred to FPHA by the FSA under subdivision (f), paragraph 1 of Executive Order 9070? This question is suggested by the adoption of a new name for USHA and of a new title for the Administrator of USHA, and also by the transfer to USHA of the administration of numerous housing projects with which USHA had nothing to do before the late war, from other agencies and departments of the Federal government.

A consideration of the First War Powers Act, 1941, and of Executive Order 9070 has convinced us that the officers and personnel of FPHA were not intended to act in such a dual capacity. The Act specifically authorizes a transfer to the corporation USHA of functions and duties exercised by other agencies. We note especially the following language of Section 601, Title 50 U.S.C.A.Appendix: "The President is hereby authorized to make such redistribution of functions among executive agencies as he may deem necessary, including any functions, duties, and powers hitherto by law conferred upon any executive department, commission, bureau, *agency, governmental corporation,* office, or officer, in such manner as in his judgment shall seem best fitted to carry out the purposes of this title * * *." This grant of power is elaborated in Section 602, Title 50 U.S.C.A.Appendix, reading: "In car-

rying out the purposes of this title the President is authorized to utilize, coordinate, or consolidate any executive or administrative commissions, bureaus, agencies, governmental corporations, offices, or officers now existing by law, to transfer any duties or powers from one existing department, commission, bureau, agency, governmental corporation, office, or officer *to another,* to transfer the personnel thereof or any part of either by detail or assignment, together with the whole or any part of the records and public property belonging thereto."

Executive Order 9070 accomplishes the transfer to the corporation FPHA (USHA) which the First War Powers Act, 1941, authorized the President to make. The relevant provision (from Par. 3) reads: "The agencies, functions, powers and duties enumerated in * *. * subparagraphs (f) * * * shall be administered *in* the Federal Public Housing Authority." To say that the function shall be administered *in* FPHA obviously means that FPHA officers and personnel shall perform it, and what the officers and personnel of the corporation FPHA (USHA) do in the performance of their official duties is ordinarily the act of the corporation. True, the officers and personnel of FPHA (USHA) are agents of NHA, but they act for NHA not only in administering the functions transferred to them from other agencies but also in administering the functions of USHA which had been charged upon that corporation since its creation. And, as pointed out above, NHA only took the place of Federal Works Agency, which took the place of the Department of the Interior insofar as the corporation USHA is concerned. Under all of these circumstances, the conduct of FPHA in operating the dormitory at Orange must be regarded as the conduct of the corporation FPHA (USHA). We account for the new name given USHA and the new title given the Administrator of USHA (which, under paragraph 17 of Executive Order 9070, would continue only so long as the quoted provisions of the First War Powers Act remained in force) by the extension USHA's functions and powers; and so far as we can determine, USHA was made an administrative unit of NHA simply for convenience, perhaps because the staff of the corporation had (while performing the functions of the corporation) accumulated experience which was needed to operate the various housing projects transferred to USHA under Executive Order 9070.

■ We attach no significance to the fact that Farm Security Administration, which erected and first administered the dormitory at Orange, was apparently no more than a conventional executive agency of the Federal government, and that plaintiff apparently could not have maintained this suit against that agency. The function of operating this dormitory at Orange was duly transferred *to* the corporation FPHA (USHA) and was assumed and performed by that corporation; and plaintiff was injured while the corporation was performing that function. FSA's original connection with the dormitory therefore seems immaterial.

■ III. May the corporation FPHA (USHA) be held liable in damages for the tort charged against it by plaintiff? This question must be answered affirmatively. Section 1405(b), Title 42 U.S.C.A., conferred upon USHA the general power to sue and to be sued. It reads: "The Authority shall sue and be sued in its own name, and shall be represented in all litigated matters by the Attorney General or such attorney or attorneys as he may designate." Under Section 1405(a), Title 42 U.S.C.A., the corporation was authorized to establish branch offices in any state and to exercise any of its powers at any place within the United States. We have not found any statute expressly qualifying the consent that the corporation may be sued which these provisions evidence, and if that consent is limited, the limitation must be inferred. Under the authorities now to be cited, we construe these provisions as exhibiting the consent of Congress that suits in tort may be maintained against the corporation FPHA (USHA); and this consent operates not only as a waiver of any privilege not to be sued which it might be thought that the corporation possessed, but also as a declaration by Congress that

the liability of the corporation in tort shall be determined by the rules of substantive law which govern the liability of individuals, subject perhaps to qualifications which need not be considered on this appeal. We have found nothing indicating that this consent to suit in tort has been limited to any particular tort, or torts, and therefore regard it as including a suit such as that before us. See: Keifer & Keifer v. Reconstruction Finance Corp., 306 U.S. 381, 59 S.Ct. 516, 83 L.Ed. 784; Casper v. Regional Agricultural Credit Corp., 202 Minn. 433, 278 N.W. 896; Prato v. Home Owners' Loan Corp., 1 Cir., 106 F.2d 128; Gillen v. Home Owners' Loan Corp., 280 N. Y. 755, 21 N.E.2d 521; Hillis v. Home Owners' Corp., 348 Mo. 601, 154 S.W.2d 761; Zins v. Justus, 211 Minn. 1, 299 N. W. 685; Federal Housing Administrator v. Burr, 309 U.S. 242, 60 S.Ct. 488, 84 L. Ed. 724; Reconstruction Finance Corp. v. J. G. Menihan Corp., 312 U.S. 81, 61 S.Ct. 485, 85 L.Ed. 595; Federal Deposit Ins. Corp. v. Corson Realty Co., 21 N.J.Misc. 146, 32 A.2d 174; Riordan v. Ferguson, 2 Cir., 147 F.2d 983; Sloan Shipyards Corp. v. United States Shipping Board, 258 U.S. 549, 42 S.Ct. 386, 66 L.Ed. 762; Federal Land Bank v. Priddy, 295 U.S. 229, 55 S.Ct. 705, 79 L.Ed. 1408; Gill v. Reese, 53 Ohio App. 134, 4 N.E.2d 273. And see generally the extensive annotation at 83 L.Ed. 794. This construction of such a general authority to sue and to be sued as was conferred upon USHA has been anticipated, and materially limited, by Congress in the Tort Claims Act of 1946, Title 28 USCA §§ 921–946, inclusive, and the fact that Congress has limited the consent is some indication that the consent originally included suits in tort. The relevant provision of the Tort Claims Act is section 945, Title 28 U.S.C.A., which reads: "From and after August 2, 1946, the authority of any Federal agency to sue and be sued in its own name shall not be construed to authorize suits against such Federal agency on claims which are cognizable under subchapter II of this chapter, and the remedies provided by this chapter in such cases shall be exclusive.".

The provision just quoted does not apply to this suit, for the tort claims to which it refers are those accruing on and after January 1, 1945. See section 931, Title 28, U.S.C.A. Plaintiff was injured on November 25, 1943, and his injury had incapacitated him by October 5, 1944, the date he left his employment. Plaintiff's claim had thus accrued before January 1, 1945.

IV. Was the operation of the dormitory at Orange a public (governmental) function, and if it was, did the consent that the corporation may be sued extend to torts committed by the corporation while performing a governmental function? Should we construe this consent as being limited to torts committed by the corporation while performing the functions with which it was vested by the United States Housing Act of 1937, and other Acts of Congress?

These questions have been suggested by our consideration of this record, and will be noticed, being involved in the broad question raised by appellants' points.

Whether the operation of the dormitory at Orange constituted a public, or governmental, function which differed from the somewhat commercial, or private, character of functions considered in decisions cited above is suggested by the use to which the dormitory at Orange was put. This dormitory was nothing but a rooming house, but only men engaged in national defense work could secure rooms there. Most, perhaps all, of the tenants, worked in the shipyards at Orange, and perhaps the majority of them worked at the yard of Consolidated Steel Corporation which fabricated Naval vessels, of which was, at least in part, devoted to that purpose. However this abbreviated statement exhibits all of the relevant facts we know, for only to this extent does the record show what kinds of ships were fabricated in the yards at Orange, and only the work of two or three men (out of several hundred) residing in the dormitory has been described.

The other question stated is suggested by the fact that the consent to be sued is expressed in an Act of Congress to which it might be thought limited.

As we have pointed out above, the relevant testimony is not wholly consistent and

the very general character of the information before us precludes our completely determining the question first stated. For all we know definitely is that the dormitory housed National Defense Workers, and National Defense is a broad term. If the operation of a dormitory so used was in some degree a public function, and if it was more of a public function than functions considered in various cases listed above, it was no more of a public function than that of the Emergency Fleet Corporation considered in Sloan Shipyards Corp. v. United States Shipping Board, 258 U.S. 549, 42 S.Ct. 386, 388, 66 L.Ed. 762, and the suits against the Fleet Corporation determined in that decision were held not to be suits against the United States but, instead, were treated as suits against the corporation. The following language of Justice Holmes seems appropriate to the facts before us, for we see nothing in these facts requiring us to disregard the corporate fiction, that is, the existence and presence of FPHA (USHA):

"These provisions sufficiently indicate the enormous powers ultimately given to the Fleet Corporation. They have suggested the argument that it was so far put in place of the sovereign as to share the immunity of the sovereign from suit otherwise than as the sovereign allows. But such a notion is a very dangerous departure from one of the first principles of our system of law. The sovereign properly so called is superior to suit for reasons that often have been explained. But the general rule is that any person within the jurisdiction always is amenable to the law. If he is sued for conduct harmful to the plaintiff his only shield is a constitutional rule of law that exonerates him. Supposing the powers of the Fleet Corporation to have been given to a single man we doubt if anyone would contend that the acts of Congress and the delegations of authority from the President left him any less liable than other grantees of the power of eminent domain to be called upon to defend himself in court. An instrumentality of government he might be, and for the greatest ends, but the agent, because he is agent, does not cease to be answerable for his acts. * * * If what we have said is correct, it cannot matter that the agent is a corporation rather than a single man. The meaning of incorporation is that you have a person, and as a person one that presumably is subject to the general rules of law."

As regards the second question stated, we think the consent to be sued should be extended to any function lawfully performed by the corporation (unless it is to be said that some governmental functions must be excluded). This consent would clearly extend to any function which Congress delegated to the corporation, and no distinction can logically be made between functions delegated by Congress and those delegated by the President, acting under and pursuant to authority granted him by an Act of Congress.

We accordingly overrule appellants' points of error 1 to 4 and 8 to 12, inclusive.

Under Points 5 and 6, appellants say that the trial court did not have jurisdiction of appellants' persons because USHA is a nonresident corporation, domiciled in the District of Columbia and was not served with process within this state.

The record shows that plaintiff's second amended original petition, on which the cause was tried, was filed on May 4, 1945, and that on May 7, 1945, a citation issued to the various defendants, or at least to USHA and its Administrator, to be served upon Marshall W. Amiss in Fort Worth, Mr. Amiss being described as the "authorized general or regional agent in charge" of a general office of all defendants, located in Fort Worth. This citation was served upon Mr. Amiss on May 9, 1945. Nonresident notice also issued on May 7, 1945, to NHA and to "United States Housing Authority, administered as Federal Housing Authority," and this notice was served in the District of Columbia, service being had on FPHA on May 11, 1945, and on NHA on May 12, 1945. A motion was filed on June 18, 1945, by NHA and its Administrator, FPHA and its Commissioner, and USHA and its Administrator, praying that the service on Amiss be quashed because he was not an agent of USHA, that the cause be dismissed against NHA and FPHA because these agencies were nonresidents of, and had not been served with-

in this state, and that the cause be dismissed in toto for various other reasons. An affidavit of Marshall W. Amiss was attached to this motion of June 18, 1945, which recited that he was Regional Director of Region V of the FPHA, with offices in Fort Worth, and that Region V included the State of Texas. His affidavit tended to show that FPHA was only a government bureau which administered not only USHA but also other functions of other Federal agencies. The aforesaid motions were heard by the trial court on July 19, 1945, and were overruled on that date.

On March 28, 1946, long after this motion was overruled, all of the various defendants, to-wit, NHA and its Administrator, FPHA and its Commissioner, and USHA and its Administrator, filed a joint answer, the same being their first amended original answer, in response to plaintiff's trial petition, setting up first a general denial and then alleging various defenses to the merits of this suit. This pleading was not, in terms, filed subject to the aforesaid motion to quash and dismiss. Still later, on April 9, 1946, almost nine months after these motions were overruled, this cause went to trial on its merits, and a final judgment was rendered on April 26, 1946.

Defendants apparently never requested any postponement. At least none is shown in the transcript and none is referred to in the briefs.

■■■ Points 5 and 6 are overruled on the following grounds: (1) We have not been able to perceive any reason why the conduct of appellants should be treated as, and given effect as, a special appearance. The corporation FPHA (USHA) could make a general appearance in this cause and thereby subject itself to the jurisdiction of the trial court. It is not to be treated as the United States (see United States v.' Shaw, 309 U.S. 495, 60 S.Ct. 659, 84 L. Ed. 888, at page 891) and its pleadings are not to be treated as documents filed by an officer of the United States Government without statutory authority so to do, or without the previous consent of Congress to maintenance of the suit. On the contrary, the corporation is an entity, separate and apart from the Federal government, and it has been specifically authorized by statute to establish offices in any state and to exercise its powers anywhere in the United States. Further, Congress has granted it general authority to sue and be sued in its own name, an authority which we have construed as extending to this suit. Under our conclusion that FPHA and USHA are the same agency, it appears from the affidavit of Amiss, to which appellants have directed our attention in their brief, that the corporation has actually established an office in this state at which Amiss is stationed, and that Amiss is the chief executive officer of the corporation in this state. However, we do not determine the effect of the service made upon Amiss. The matter significant here is that the corporation FPHA (USHA) was actually in this state when the service was made upon Amiss and when the trial court overruled the motion to quash, and that so far as we have been able to see, this corporation had the same power to make a general appearance in this particular case as any private corporation would have had. (2) Since the corporation FPHA (USHA) could make a general appearance in this particular case, we shall apply to its motion to quash and to its subsequent conduct the same rules which would be applied to a private litigant. Such treatment is but an incident of the corporation's liability to suit in this particular action, and the decision in United States v. Shaw, 309 U.S. 495, 60 S.Ct. 659, 84 L.Ed. 888, at page 891, et seq., shows that it is the absence of consent to be sued which determines the effect (as an appearance) of the conduct which may be under consideration. Our law makes no provision for special appearances by anyone; one either makes a general appearance or else the particular conduct does not confer jurisdiction in personam. (3) Therefore the filing of the motion to quash and dismiss constituted a general appearance by the corporation FPHA (USHA) in this particular case and subjected that corporation to the jurisdiction of the trial court. Rules 121, 122 and 123, Texas Rules of Civil Procedure; York v. State 73 Tex. 651, 11 S.W. 869; 4 Tex.Jur. 628 (Par. 12); and 4 Tex.Jur. 651 (Par. 27). (4) If the trial court erred in overruling the motion to

quash and dismiss (in so far as that motion attacked the sufficiency of the service on Amiss and the trial court's jurisdiction in personam of the corporation) the error was harmless. The cause was not tried on its merits for many months after the expiration of the period prescribed in Rule 122, and appellants proceeded to trial on the merits without any objection subsequent to the motion overruled on July 19, 1945. Since any error in overruling this motion was harmless the appellants' Points 5 and 6 may be overruled for that reason. Russell v. Finance Corporation, Tex.Civ.App., 44 S.W.2d 1003.

Under Point 7 appellants say that plaintiff could not maintain this suit because he had a right to compensation under the United States Employees' Compensation Act of September 7, 1916, being chapter 15, Title 5 U.S.C.A. This point is overruled on the authority of the following decisions: Hines v. Dahn, 8 Cir., 267 F. 105, page 114, affirmed under the style of Dahn v. Davis, 258 U.S. 421, 42 S.Ct. 320, 66 L.Ed. 696; Payne v. Cohlmeyer, 7 Cir., 275 F. 803; Panama Railroad Co. v. Strobel, 4 Cir., 282 F. 52, following Panama R. R. Co. v. Minnix, 4 Cir., 282 F. 47. According to these decisions, the United States Employees' Compensation Act does not deprive the employee of any remedy he may have at common law, although the employee is bound by his election (as against the United States Government) if he receives compensation under the Employees' Compensation Act.

Posey v. Tennessee Valley Authority, 5 Cir., 93 F.2d 726, which appellants cite, is not in point. The court there expressly pretermitted any decision of the question now before us and based their holding upon a construction of the Tennessee Valley Authority Act, Title 16 U.S.C.A. § 831 et seq. Section 831b, Title 16 U.S.C.A., extended the United States Employees' Compensation Act to employees of the Author-

ity, and in view of this provision and the peculiar wording of Article 831c(b), the Circuit Court of Appeals construed said Article 831c(b) as evidencing only a limited consent that the corporation be sued, and as showing that the employee's exclusive right against the Authority was such right as the United States Employees' Compensation Act conferred upon him. Since the Tennessee Valley Authority Act specifically limited the employee's right of compensation, the cases we have cited above were not in point, and the Circuit Court of Appeals so construed them.

Under our construction of sections 1405(b) and 1405(a), Title 42 U.S.C.A., Congress has consented that this particular suit can be maintained and has declared that the liability of the corporation FPHA (USNA) shall be determined (in general) by rules of substantive law applicable to private parties. Congress has thus declared the plaintiff to be vested with an independent right to damages which is precisely equivalent to the independent right the employee had in Hines v. Dahn and Dahn v. Davis and in other decisions cited above.

Under Point 13, appellants say that the trial court erred in adjudging court costs against the defendants. Point 13 is overruled on the authority of Reconstruction Finance Corp. v. J. G. Menihan Corp., 312 U.S. 81, 61 S.Ct. 485, 85 L.Ed. 595; Grand River Dam Authority v. Grand-Hydro, 188 Okl. 506, 111 P.2d 488.

Under Point 14, appellants say that the verdict was excessive. Point 14 is overruled. We have read the statement of facts and conclude that there is evidence sufficient to sustain the award of $9,500.

This disposes of all points of error made by appellants. No reversible error appearing, the judgment of the trial court is affirmed.